521 A.2d 1

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**George Emil BANKS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1986.

Decided Feb. 13, 1987.

Reargument Denied May 28, 1987.

320

Basil G. Russin, Al Flora, Jr., Wilkes-Barre, for appellant.

Robert J. Gillespie, Jr., Dist. Atty., Joseph C. Giebus, Asst. Dist. Atty., Wilkes-Barre, Marion E. MacIntyre, Deputy Atty. Gen., Harrisburg, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

In the early morning hours of September 25, 1982, George Emil Banks, appellant, went on a rampage in and near the City of Wilkes-Barre in Luzerne County. In the space of about one hour, appellant shot fourteen people with a Colt AR–15 semi-automatic rifle, killing thirteen and wounding one. All but one of the dead were the women and children who made up appellant's extended family; the other two victims were strangers (one survived) who were in the wrong place at the wrong time.

Following a lengthy jury trial before the Honorable Patrick J. Toole in the Court of Common Pleas of Luzerne County (with a jury selected in Allegheny County), appellant was convicted on June 21, 1983 on twelve counts of murder of the first degree. He was also convicted of murder of the third degree, attempted murder, aggravated assault, recklessly endangering another person, robbery and theft of a motor vehicle. The next day, June 22, 1983, in a separate sentencing proceeding before the same jury, appellant received twelve sentences of death. On October 17, 1985, the Court of Common Pleas of Luzerne County, per Judge Toole, denied appellant's post-verdict motions for a new trial and/or in arrest of judgment. Appellant was formally sentenced on November 22, 1985,[1] and he now appeals his convictions and judgments of sentence.[2] We affirm.

The extensive trial record in this case, viewed in the light most favorable to the Commonwealth as verdict winner, discloses the following. On the evening of September 24, 1982, appellant attended a birthday party for one Stanley O'Brien at the Galbraith family residence in Wilkes-Barre. Appellant arrived at the party in the vicinity of 9:00–9:30 p.m., accompanied by two of the victims, Dorothy Lyons and Regina Clemens, each appellant's girlfriend. Also present at the party was another victim, Susan Yuhas, Mrs. Clemens' sister and also a girlfriend of appellant. While at the party appellant drank some beer, played darts and conversed with numerous guests. Shortly after 9:30 p.m., appellant exchanged "T-shirts" with Sharon Gomb, as each admired or joked about the sayings printed on each other's shirt. Appellant's T-shirt read: "Kill Them All And Let

---

1. In addition to the twelve sentences of death, which were made "consecutive," appellant received consecutive sentences of imprisonment of ten to twenty years on the conviction for murder of the third degree, five to ten years on the conviction for attempted murder, and ten to twenty years on the conviction for robbery. The remaining convictions were deemed to have merged for sentencing purposes.

2. This Court has direct appellate jurisdiction over such appeals. 42 Pa.C.S.A. §§ 722(4) and 9711(h)(1); Pa.R.A.P.Rule 702(b).

God Sort It Out." [3] Appellant's companions, Ms. Lyons and Ms. Clemens, appeared to become upset with this exchange of shirts. Numerous guests and hosts at the party observed appellant drink some beer, but testified that his speech and movements were "normal" and coordinated and that he did not appear to be intoxicated.

Appellant and Regina Clemens left the party in the vicinity of 10:30 p.m. Between 12:00–1:00 a.m. on September 25, 1982, appellant called the Galbraith house and spoke with Dorothy Lyons. After she hung up the phone, she was very upset and crying, and she asked her nephew, David Galbraith, to get appellant's rifle for her. The rifle, a Colt AR–15, had been kept at the Galbraith house for several weeks. Ms. Lyons took the rifle, which was established by ballistics and other evidence as the murder weapon, and left the party after 1:00 a.m. in a car, accompanied by Susan Yuhas.

Kenneth Scott knew appellant and he testified that he saw him in the parking lot of the Sherman Hills Apartments at approximately 1:15 a.m. Appellant was carrying a garbage bag containing several small boxes. Ms. Lyons had an apartment in the Sherman Hills Apartments in Wilkes-Barre and had stored boxes of ammunition there for appellant. (Small boxes of ammunition were found in the house where appellant eventually surrendered to police.) When Mr. Scott called to appellant and walked toward him, appellant told Mr. Scott that he ought to be careful yelling at people like that, he could get himself shot. The two spoke briefly and appellant seemed to be upset, although his speech was understandable and "normal," as was his walking.

At approximately 2:00 a.m., a group of four teenagers had left a friend's house on Schoolhouse Lane in Wilkes-Barre and were walking to their car when they heard a series of gunshots which seemed to be coming from 28

3. Ms. Gomb, who changed her shirt in a separate room with a companion actually exchanging the shirts, was wearing a shirt which read: "I Have A Drinking Problem—I Can't Get Enough."

Schoolhouse Lane (appellant's home). The four were Raymond Hall, James Olson, Tommy Demellier and Molly McBride. At this time, appellant came out from the back of the house walking toward the group when Raymond Hall, recognizing appellant, stated "I know you." Appellant responded "Yeah, you're not going to live to tell anybody about this," and he aimed the AR-15 at Mr. Hall and shot him fatally. He then turned toward James Olson and shot him. Mr. Olson, although seriously wounded, survived to testify at trial. Thomas Demellier knocked Ms. McBride to the ground, seeking cover. Appellant, holding the rifle, dressed in green army fatigues with an ammunition bandolier around his chest and shoulders, backed away from them.

Later that morning, eight women and children were found shot to death at appellant's home at 28 Schoolhouse Lane. Most had been shot through the head at close range. The dead were: Susan Yuhas (age: twenty-three), and her two children to appellant, Bowendy Banks (age: four) and Mauritania Banks (age: one) who resided with appellant; Dorothy Lyons (age: twenty-nine), and her two children, Foraroude Banks (age: one) and Nancy Lyons (not appellant's daughter; age: eleven) who sometimes resided with appellant; Regina Clemens (age: twenty-nine) and her daughter to appellant, Montanzima Banks (age: six), who had resided at 28 Schoolhouse Lane until about two weeks before the shooting.

Joseph Yencha had been drinking at a nearby lounge, the Cabaret, until about 2:10 a.m. on September 25, 1982. He was seated in his car when appellant walked up to him, pointed the rifle at his head, and told him to "move over or I'll blow your f___ing head off." Mr. Yencha moved over, appellant got behind the wheel and he told Mr. Yencha to be quiet, he didn't want any more trouble because he had just "killed his two children." Appellant asked Mr. Yencha if he wanted to get out, then he stopped the car, allowed him to get out, and told him that he would leave the car where it could be found. The car was found later that day, with an unopened bottle of gin and a bullet cartridge in the car.

At 2:30 a.m., shots were heard at the Heather Highlands Trailer Park in nearby Jenkins Township. Residents of the trailer park called the police when they heard the shots and then a male voice shouting "That's what you get for f___ing with me. You f___ with me some more, I'll come back and kill the rest of you." When police officers arrived, they found Angelo Vital and Keith Mazzillo, alive and unharmed, outside the Mazzillo trailer. They also found the bodies of Sharon Mazzillo (age: twenty-four), a former girlfriend of appellant's, and their son, Kissmayu Banks (age: five), as well as Sharon's mother, Alice Mazzillo (age: forty-seven) and Scott Mazzillo (age: seven), Sharon's nephew. Angelo Vital and his brother, Keith Mazzillo, Alice Mazzillo's sons, witnessed the horrifying events at the trailer, and they testified at trial.

Angelo Vital, ten years of age at the time of trial, testified that appellant came into the trailer and said "I shot some of my family, now I'm going to shoot some of yours." Appellant then shot Kissmayu who had been asleep on the couch. Sharon and Alice Mazzillo tried to push appellant out of the trailer, and Alice then went into the back room to use the telephone, with Angelo following his mother. Angelo heard another shot and looked out to see appellant chasing Scott Mazzillo, saying "You called my son a nigger." Appellant then shot Scott Mazzillo, kicked him and hit him with the rifle. Appellant turned and fired one shot at Alice Mazzillo as she tried to call the police, striking her in the face and killing her, then left, telling Angelo "I'll get you next time."

Keith Mazzillo, thirteen years of age at the time of trial, testified to the same effect. He heard appellant state "I heard you call my son a little nigger," and saw him choke, kick, hit and shoot Scott Mazzillo. He did not see appellant shoot the others. Sharon Mazzillo's body was found outside the trailer, where Keith had heard her arguing with appellant. Both Angelo Vital and Keith Mazzillo identified the AR–15, introduced into evidence at trial, as the weapon appellant used that morning.

At about 6:00 a.m., appellant arrived at his mother's house. His mother, Mrs. Mary Yelland, told the police that appellant stated "I killed them. I killed them all." Mrs. Yelland called appellant's house and spoke with a police officer. Appellant got on the telephone with Luzerne County Detective James Zardecki and asked how his kids were. Detective Zardecki told him the children were hospitalized and seriously hurt, but appellant responded "You're lying. I killed them. I know they're dead.... Just tell me I killed them and I'll kill myself." After a minute or two of Detective Zardecki trying to convince appellant that his children were alive, and repeated statements by appellant that he knew they were dead, the line went dead. Detective Zardecki had no trouble understanding appellant who was responsive and spoke in a "normal" tone.

After this call, appellant told his mother to drive him to his friend's (Jacob Whitt's) house at 24 Monroe Street in Wilkes-Barre. On their way there, their vehicle was involved in a traffic accident. Appellant stated he was going to kill the other driver, but his mother convinced him not to, and the two drove away. When they arrived at Monroe Street, appellant went into the house, telling his mother he would never see her again. He then went inside and prepared himself for a siege.

Mrs. Yelland returned to her home where, a short time later, police officers came believing appellant was there. Mrs. Yelland informed them appellant was at 24 Monroe Street. Police officers then surrounded the house by about 7:00 a.m.

Between 7:30–8:00 a.m., Mrs. Geraldine Whitt called her son Jacob's home to talk with him, and appellant answered the telephone. They recognized each other's voices. Mrs. Whitt asked appellant what he was doing there, and he replied "I killed them all. They're all dead. I killed my whole family.... I barricaded myself in Jake's house and I came here to die." He also told Mrs. Whitt that it was too late to pray for him now, "but you can pray for my soul."

Mrs. Whitt had no trouble understanding appellant, who sounded calm and coherent.

Telephone communications were established by police officers with appellant. Various civilians and police officers spoke with appellant, trying to convince him that his children were alive and in need of blood, and that he should therefore give himself up. Police arranged to have a radio broadcast played to corroborate the ruse that appellant's children were alive. While he persisted to tell people that they were lying because he knew he killed his children who he did not want "to grow up in a white racist world," eventually he gave himself up, at 11:15 a.m., after speaking with Mr. Robert Brunson, an acquaintance of appellant. Appellant told Officer Donald Smith he would have to break the window to hand the gun out, which he did, and he asked the officer not to shoot him. After handing out the AR–15 with a "banana" ammunition clip attached and two additional clips, he came out of the house with his hands above his head, as he had been instructed. Neither Officer Smith nor Mr. Brunson, nor any of those who spoke with appellant that morning, had any difficulty understanding appellant, who was calm and responsive to questions and instructions. Most of the witnesses testified that appellant did not appear to be intoxicated, although there was some evidence that he had an odor of alcohol about him.

Appellant was taken to the Wilkes-Barre police station and advised of his constitutional rights by Detective Patrick Curly. He told police officers there that he knew they had been lying to him about the children being alive. He further stated to Detective William Maguire that "he wished he was dead, because he stated that the State was going to kill him, anyway, in the electric chair."

The Commonwealth also introduced evidence from various witnesses to show appellant's apparent motive for his rampage. This evidence supported the inference that appellant was disturbed about losing control over his extended family. Regina Clemens had moved out of appellant's residence about two weeks before the shooting spree, and

was planning to move to Florida to get away from appellant. In the week before the murders, appellant was seen slapping and hitting Susan Yuhas, Regina Clemens' sister, stating "You're just like your sister Gina. You're going to leave just like her."

Appellant's mental condition at the time of the shootings was a major issue at trial, and the expert opinions of the psychiatric witnesses for the defense were diametrically opposed to the opinions of the Commonwealth's expert psychiatric witnesses. Defense counsel, the Luzerne County Public Defender and two assistant public defenders, presented numerous lay witnesses and three psychiatrists in an attempt to establish that appellant was legally insane under the *M'Naghten* rule, which despite repeated challenges remains the test for determining legal sanity and criminal responsibility in this Commonwealth. *Commonwealth v. Oblek*, 496 Pa. 519, 437 A.2d 1162 (1981). Under *M'Naghten*, a defendant is legally insane, and absolved of criminal responsibility, if "at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing, or if he did know it that he did not know what he was doing was wrong." *Commonwealth v. Roberts*, 496 Pa. 428, 434, 437 A.2d 948 (1981), quoting *The Queen v. M'Naghten*, 10 Cl. & Fin. 200, 8 Eng.Rep. 718 (1843). Or as it is sometimes stated in the streamlined version, "an accused is criminally responsible [and not legally insane] unless at the time of committing the act, due to a defect of reason or disease of the mind, the accused (1) did not know the nature and quality of the act or (2) did not know that the act was wrong." *Commonwealth v. Tempest*, 496 Pa. 436, 440, 437 A.2d 952 (1981) (citations omitted).

In addition to the insanity defense, counsel also presented the defense of diminished capacity, *Commonwealth v. Walzack*, 468 Pa. 210, 360 A.2d 914 (1976), attempting to reduce appellant's degree of guilt by showing that, because of his mental condition and intoxication due to consumption of

alcohol (beer and gin) and pills (Dilantin), he was unable to form the specific intent to commit murder of the first degree. There was evidence that appellant drank beer at the Galbraith's party, and several witnesses detected an odor of alcohol about him the following morning. Additionally, appellant had told lay witnesses and psychiatrists that he had been drinking gin for several days prior to and including September 25, 1982 and that, after he left the birthday party, he went home and took some pills (Dilantin) which he washed down with gin, and then passed out.

As to the insanity defense, lay and psychiatric witnesses for the defense presented a profile of a disturbed and paranoid man. Appellant, a prison guard at the state correctional institution in Camp Hill, was forty years of age at the time of the murders. He grew up taunted and tormented by both blacks and whites as he was the son of a black father and a white mother. Appellant was constantly called "half-breed," "zebra," and other derogatory names, as was his brother. Through the years, he developed a persecution complex and became obsessed with the paranoid delusion that there were soon to be international race wars and uprisings. In fact, he had written a chapter of a novel, featuring himself and his sons, dealing with survival in the aftermath of a race war. He prepared himself for the race wars by purchasing weapons, planting food along escape trails in the woods and reading the standard "survivalist" fare such as *Soldier of Fortune* magazine. At various times, he had spoken of killing himself, of killing people at a shopping mall, and of killing his children rather than see them brought up as he had been in a racist society.

The defense called three psychiatrists as experts. All three agreed, essentially, that appellant had been, before, during and after the murders, suffering from a severe mental defect, paranoid psychosis with paranoid delusions. All also agreed that, when dealing in the area of appellant's paranoid delusions concerning racism and race wars, appellant was completely obsessed and singularly focused, but that all other aspects of his personality, including his cogni-

tive functioning, were "normal" and intact. (Appellant had a high I.Q., over 120, and was described as being in the upper five percent of the population based on intelligence.)

Dr. Anthony J. Turchetti, a forensic psychiatrist who was appointed by the lower court in October, 1982, to examine and evaluate appellant, stated that in his opinion, appellant was, on September 25, 1982 (the date of the killings), actively suffering from psychosis paranoia which affected his thoughts, discretion and judgment and "because of this, I don't think he was capable of distinguishing right from wrong at that time." [4] Dr. DeWitt Weatherly and Dr. Michael K. Spodak also testified as expert witnesses for the defense. Drs. Weatherly and Spodak, both forensic psychiatrists licensed to practice their specialty in Maryland but not in Pennsylvania,[5] each testified that, in his opinion, appellant did not, as a result of his paranoid psychosis, understand the nature and quality of his criminal acts on September 25, 1982 and was unable to distinguish between right and wrong with respect to those acts.

Appellant also took the stand himself, against the advice of counsel, to offer a "partial" defense of a conspiracy against him. This theory will be discussed more fully in discussing appellant's competency to stand trial, but essentially was that appellant was the victim of a racist conspiracy involving, among others, police officers, the Mayor of Wilkes-Barre, the District Attorney's office and the judge. Appellant admitted shooting most of the victims, but claimed that Detective Curly shot and killed two of the

4. Dr. Turchetti had examined appellant on eight occasions in October, 1982 and once in February, 1983. His opinion was based "almost solely" on what appellant told him during these examinations. Dr. Turchetti's opinion was seriously discredited by the prosecutor on cross-examination.

5. Neither Dr. Weatherly nor Dr. Spodak had previously been an expert witness in a case dealing with insanity under the Pennsylvania M'Naghten standards. Maryland uses, according to these psychiatrists, the more "liberal" American Law Institute standards, namely that an actor is not criminally responsible for his acts where at the time of committing the act, as a result of mental disease or defect, he lacks the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

victims and that Detective Curly and others had moved the corpses, altered their features, "doctored" their wounds and concealed or destroyed evidence, all as a part of a racist conspiracy.

In rebuttal, the Commonwealth introduced lay and expert testimony to establish appellant's sanity. Dr. Park E. Dietz and Dr. Robert L. Sadoff, both of whom are forensic psychiatrists licensed to practice their speciality in Pennsylvania,[6] testified for the Commonwealth. Both psychiatrists reviewed previous psychiatric evaluations of appellant, observed him in court at trial and on previous occasions, examined appellant, reviewed numerous documents and letters, and examined the extensive testimony of witnesses and statements of people who had been in contact with appellant on September 24–25, 1982.

While Drs. Dietz and Sadoff basically agreed with the diagnosis of the defense psychiatrists that appellant suffered from a serious mental defect, paranoia psychosis, which did not otherwise impair his personality, intelligence and cognitive functioning, they did not agree with their expert opinions. Each testified that, in his opinion, appellant was able to know and understand the nature and quality of his acts, to distinguish between right and wrong, and to form the specific intent to murder. Each doctor also seriously questioned the bases for the defense psychiatrists' opposite conclusions. Significant factors in forming their opinion that appellant knew the nature and quality of his acts and knew his acts were wrong included appellant's behavior and repeated acknowledgements that he knew he had killed his family and children, his threats to kill at least several of the victims before he actually shot them, his threats to return to kill Angelo Vital and Keith Mazzillo, and many other indications that he knew and understood

6. Dr. Turchetti testified on cross-examination that Dr. Sadoff, the only expert who was board certified as a forensic psychiatrist by the American Board of Forensic Psychiatrists and a frequent publisher of articles and books in the field, was one of the leading psychiatrists in the country.

that what he did was wrong.[7] There were also numerous indications of premeditation and planning, including appellant's telephone call to Dorothy Lyons to get the AR-15 for him, and his driving to the Sherman Hills Apartments to get the ammunition.

The jury rejected appellant's defenses and, after deliberating for about five hours, with one request for clarification as to the degrees of homicide, returned its verdicts on June 21, 1983, finding appellant guilty of murder of the first degree on twelve counts, murder of the third degree for the killing of Raymond Hall, attempted murder of James Olson, and on the remaining counts of assault, robbery and theft.

The following day, a sentencing proceeding was conducted before the same jury, pursuant to the Sentencing Code. 42 Pa.C.S.A. § 9711(a). The Commonwealth sought the death penalty on each conviction for murder of the first degree on three aggravating circumstances under section 9711(d), namely that appellant knowingly created a grave risk of death to other persons (d)(7), that appellant had a significant history of felony convictions involving violence (d)(8), and that appellant had been convicted of another offense committed at the time of the offenses at issue for which a sentence of life imprisonment or death was imposable (d)(10). Appellant presented three mitigating circumstances under section 9711(e), namely that appellant was under the influence of extreme mental or emotional disturbance (e)(2), the capacity of appellant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (e)(3), and "any other evidence of mitigation concerning the character and record of defendant and the circumstances of his offense" (e)(8). After deliberating for almost six hours, the jury returned twelve sentences of death based on its finding of one aggravating circumstance ((d)(10)–other offenses for which death sentence was imposable) which outweighed the

7. These indications included his belief that he would probably get the electric chair for his deeds, his barricading himself at 24 Monroe Street and his telling Mrs. Whitt to "pray for his soul."

one mitigating circumstance it found ((e)(2)–extreme mental or emotional disturbance). 42 Pa.C.S.A. § 9711(c)(iv).

■ From the foregoing, we have no difficulty in finding the evidence sufficient to sustain appellant's convictions beyond a reasonable doubt.[8] As we have seen, there was overwhelming evidence that appellant premeditated, planned and specifically intended to kill his family members.[9] And, there was abundant evidence, both from lay witnesses and the Commonwealth's expert and well-qualified psychiatric witnesses, to support the jury's finding that appellant was legally sane and criminally responsible for his acts of September 25, 1982 under *M'Naghten,* and that he possessed the capacity to form the specific intent to kill. *See Commonwealth v. Zettlemoyer, supra* note 8 at 500 Pa. 27–39 (evidence that appellant Zettlemoyer had a "schizoid personality with paranoid features" was insufficient to establish defense of diminished capacity); *Commonwealth v. Weinstein,* 499 Pa. 106, 114, 451 A.2d 1344, 1347 (1982) (psychiatric testimony under *Walzack* /diminished capacity is irrelevant unless "it speaks to mental disorders affecting the cognitive functions [of deliberation and premeditation] necessary to formulate a specific intent"); *Commonwealth v. Tempest, supra* (although mother, who drowned her son and then went downstairs to watch game shows on television until her husband came home was mentally ill, she was nevertheless legally sane under *M'Naghten,* as evidenced by her statements made during and after the drowning); *Commonwealth v. Zlatovich,* 440 Pa. 388, 269 A.2d 469 (1970) (mother who shot her four children rather than see her children taken from her by her husband was legally

8. As in all appeals involving a judgment of sentence of death, this Court will review the record to determine whether the evidence is sufficient to sustain the conviction(s) for murder of the first degree, even though the appellant has not specifically challenged the sufficiency of the evidence. *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

9. "A criminal homicide constitutes murder of the first degree when it is committed by an intentional killing." 18 Pa.C.S.A. § 2502(a).

sane under *M'Naghten;* lay testimony alone was sufficient to rebut the opinion of three defense psychiatrists that mother was insane).

We turn now to appellant's specific assignments of error. Appellant first and principal claim is that the lower court erred in finding him to be competent to stand trial. On February 28, 1983, pursuant to defense counsels' application under section 402–403 of the Mental Health Procedures Act of 1976, Act of July 9, 1976, P.L. 817, No. 143, 50 P.S. §§ 7402–7403 (supp. 1986), a preliminary competency hearing was held at which the court scheduled a full evidentiary hearing. The reason for defense counsels' concern over appellant's competency was his stubborn insistence on pursuing his "conspiracy" theory, i.e., that the police officers, the Mayor of Wilkes-Barre, the District Attorney's office and perhaps the court were conspiring against him in concealing and altering evidence, shooting some of the victims, rearranging some of the corpses and covering up some of their wounds, and obstructing his attempts to expose the "conspiracy." He viewed his trial as a means of "taking the mask off the devil."

The first pre-trial competency hearing was held on March 14, 1983, at which much lay testimony was introduced, as well as the expert opinions of Dr. Michael Spodak (for the defense) and Dr. Robert Sadoff (for the Commonwealth). The lower court allowed broad latitude to both sides to explore appellant's competency. Again, the psychiatric opinions were diametrically opposed. Dr. Spodak testified that, while appellant's cognitive functions and intelligence were reasonably unimpaired, his paranoid delusions of the conspiracy were so strong that he would be substantially unable to understand the nature and object of his proceedings or to participate and assist in his defense. (The Mental Health Act provides that a person shall be deemed incompetent to stand trial if he is "substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense...." 50 P.S. § 7402(a)) Dr. Sadoff, on the other hand, testified unequiv-

ocally that appellant was able to follow the advice of counsel and to participate and assist in the defense, although he might choose not to. He also testified that, in his opinion, appellant fully understood the nature and object of the pending criminal proceedings as a trial to determine his guilt or innocence and sentence if found guilty, even though he choose to use the proceedings to advance his own agenda and to expose the "conspiracy" to the public. On March 18, 1983, the court issued an order declaring appellant was "not substantially unable to understand the nature or object of the proceedings against him, or to participate and assist in his defense," and he directed appellant to stand trial.

At the request of defense counsel, a second pre-trial competency hearing was held on May 6, 1983, with Dr. Sadoff again testifying for the Commonwealth and Dr. DeWitt Weatherly for the defense. Dr. Weatherly stated that, in his opinion, because of appellant's obsessive and paranoid preoccupation with this perceived conspiracy, he would be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense. On cross-examination, however, Dr. Weatherly conceded that appellant did not have a loss of cognitive function, that he knew he was in a court of law for a competency hearing, that he was charged with thirteen counts of homicide and other offenses for which the penalty could be execution, that he knew what the functions of the various "players" in the criminal judicial system were, that he understood the insanity defense and that he would not be executed if he was found not guilty by reason of insanity, and that he knew he could cooperate with counsel in presenting that defense or he could refuse to cooperate. The crux of Dr. Weatherly's and defense counsels' position that appellant was incompetent to stand trial was that, despite appellant's cognitive awareness and intellectual capacity, he wanted to use the criminal trial to "go through some sort of sensational, explosive proceeding to reveal his story and ... wake up the community, arouse the community, precipitate a race war, revolution." In summa-

ry, Dr. Sadoff testified for the Commonwealth that his opinion had not changed, and that appellant remained competent to stand trial despite his obsession with a conspiracy and his choice to use the trial as a forum for his personal agenda.

Appellant testified at this proceeding, and verified his obsessive, conspiracy delusion as well as his cognitive abilities to converse, respond to questions appropriately and to understand the nature and object of the proceedings. (For example, when asked by the District Attorney on cross-examination whether he shot Raymond Hall, appellant refused to answer the question "under the Fifth Amendment, whatever that is.") From the bench, the court again declared appellant competent to stand trial.

On May 13, 1983, there was a hearing on the Commonwealth's petition to order a psychiatric evaluation of appellant, with appellant present. Appellant's responsiveness to the court's questions and his overall alertness was apparent at this proceeding.[10] He asked pertinent questions about

10. For example, the following exchange took place:
DEFENDANT: One thing I'd like to say, sir, if I could?
THE COURT: Sure.
DEFENDANT: I'm willing to cooperate fully with the District Attorney and Dr. Sadoff [in allowing a psychiatric examination], but I would be more inclined to do so after this business with the—what do you call it? Now, I thoroughly understand everything you said, but I was hoping that perhaps it could be maybe postponed until after we get this business with the exhumation settled, once and for all.
THE COURT: Well, Mr. Banks, I don't control the exhumation application.
DEFENDANT: I understand.
THE COURT: That's in the hands of another judge.
You also understand that we're leaving on Sunday, and so, while I am anxious to move things along, I certainly don't want to prejudice you in any way. That's why I've warned you and I warn you again: Please remember—everything you say—and I'm sure your attorneys have told you this, time and time again—
DEFENDANT: I'm thoroughly aware of it, yes, sir.
THE COURT: Anything you say that is in any way incriminating, I suggest to you that in your particular position, anything you say may be incriminating.
DEFENDANT: That don't matter to me. All I want to do is get it over with. As far as I'm concerned, you know, I'm dead, anyway.

the scope of the privilege against self-incrimination, and about the timing of a petition to exhume the bodies of the victims that his attorneys had filed at his insistence (against their judgment). Appellant believed that exhumation would verify his conspiracy theory and show that the victims' corpses had been tampered with before photographs had been taken of the crime scene.

On May 20, 1983, defense counsel filed another petition seeking a competency examination, but did not offer any additional evidence of incompetency. Counsel also filed a petition to withdraw as counsel. The court denied these petitions, the gravaman of which was described in Judge Toole's excellent opinion in support of denial of post-verdict motions, as follows:

> Essentially, counsel contend that because of Banks' contention that the trial was part of a conspiracy, because he would not agree to a defense of insanity, because he was not consistent, because he did not heed the advice of his counsel or follow their proposed strategy, and because he was not always rational as they deemed or desired it, that this was clear evidence that he was incompetent to stand trial.

Slip op. at 13.

Defense counsel also made three motions for a competency determination, during trial, all of which were denied summarily by the lower court. Two of these requests were predicated on a diagnosis by the Commonwealth's expert witness, Dr. Dietz, that appellant was paranoid and delusional, and upon counsels' belief that this condition rendered appellant incompetent to stand trial. The most vigorous request for a competency determination came prior to appellant's taking the stand against the advice of counsel. A lengthy colloquy preceded appellant's testifying during which he demonstrated his understanding of the proceedings, that he did not have to testify, of the effect that his testifying would have on his right to remain silent and that

Notes of Testimony (N.T.), May 13, 1983 at 13–14.

he would be bound by the same rules of evidence as would anyone else. N.T. June 16, 1983 at 1638–47.

What most concerned counsel was their belief that appellant intended to introduce photographs of some of the corpses, which he believed would prove his conspiracy theory to the jury. Obviously, counsel was concerned about the prejudicial effect that introduction of such photographs might have on the jury, and about the liklihood that the Commonwealth would introduce additional photographs of the corpses to disprove appellant's theory. (In fact, this is what occured at trial, with a comprehensive and appropriate cautionary instruction given by the court at the time the photographs were introduced. *Id.*)

Prior to trial, on May 9, 1983, a suppression hearing was held at which the court ruled that the Commonwealth would not be permitted to introduce any photographs of the corpses. At this hearing, appellant informed the court that he wished to use some of the photographs to prove that the corpses had been tampered with. The court advised appellant that introduction of the photographs might be prejudicial and that if he did introduce some of the photographs at trial, the Commonwealth might then be able to introduce additional photographs. Appellant indicated that he understood, but that he planned to do so anyway.

■ Appellant now claims that the lower court erred in ruling that he was competent to stand trial. We do not agree.

■ As noted, a person is incompetent to stand trial where he is "substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense." 50 P.S. § 7402(a). Due process considerations also come into play when the competency of the accused is in question. As this Court stated in *Commonwealth v. Martinez*, 498 Pa. 387, 391, 446 A.2d 899, 901 (1982):

It is well established that:

"the test to be applied in determining the legal sufficiency of [a defendant's] mental capacity to stand trial ... is ... his ability to comprehend his position as one accused of murder and to cooperate with his counsel in making a rational defense. *See Commonwealth v. Moon* [383 Pa. 18, 117 A.2d 96 (1955)], and *Commonwealth ex rel. Hilberry v. Maroney* [417 Pa. 534, 544, 207 A.2d 794, 799 (1965)]. Or stated another way, did he have sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and have a rational as well as factual understanding of the proceedings against him. *See Dusky v. United States,* 362 U.S. 402 [80 S.Ct. 788, 4 L.Ed.2d 824] (1960). Otherwise, the proceedings would lack due process: *Bishop v. United States,* 350 U.S. 961 [76 S.Ct. 440, 100 L.Ed. 835] (1956)."

*Commonwealth ex rel. Hilberry v. Maroney,* 424 Pa. 493, 495, 227 A.2d 159, 160 (1967).

Equally well established is that the person asserting incompetency has the burden of proving incompetency by clear and convincing evidence, 50 P.S. § 7403(a),[11] and that the determination of competency rests in the sound discretion of the trial judge which will not be disturbed absent a clear abuse of discretion. *Commonwealth v. Martinez, supra; Commonwealth v. Ware,* 459 Pa. 334, 356, 329 A.2d 258, 269 (1974); *Commonwealth v. Hart,* 501 Pa. 174, 177, 460 A.2d 745 (1983); *Commonwealth v. Davis,* 459 Pa. 575, 330 A.2d 847 (1975).

As we have seen in the preceding recitation of facts, the lower court gave broad latitude and every opportunity to defense counsel to establish appellant's incompetency to stand trial. In ruling that appellant was competent, the court had ample evidence, from lay witnesses and from expert psychiatric witnesses, upon which to base its determination. Moreover, the court also had many opportunities

11. Prior to passage of the Mental Health Act of 1976, the burden was upon the party asserting incompetency to prove it by a preponderance of the evidence. *Commonwealth v. Kennedy,* 451 Pa. 483, 487, 305 A.2d 890, 892 (1973).

to personally observe appellant not only at his competency hearings and at trial, but also during hearings and arguments on several pre-trial motions.

The court stated in its opinion denying appellant's post-trial motions:

> As the trial Judge, I would also note at this time I had the opportunity to observe Banks' demeanor and participation during the course of the proceedings, and I found nothing to indicate or cast any doubt on his competency to stand trial. His behavior, demeanor and presentations throughout these proceedings corroborated rather than contradicted the finding of competency.

Slip op. at 15, n. 2. At one point during trial, appellant decided to personally cross-examine Coroner Joseph M. Shaver and to use the photographs of some of the corpses in conducting his cross-examination. Prior to conducting the colloquy with appellant preceding appellant's testimony in his own defense, the court responded to defense counsels' concerns for appellant's competency, stating: "Again, the Court is satisfied, and I'm more satisfied as I watch him every day in court, of his competency.... Even his demeanor, his questioning, in my opinion, establish competency again." N.T., June 8, 1983 at 454. The court's personal assessment and determination of appellant's competency were fully supported by the record, and it was well within the court's discretion, therefore, to rule that appellant had not met his burden of demonstrating, by clear and convincing evidence, that he was substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense.[12]

Nevertheless, appellate counsel would have us reverse the lower court's determination of competency because appellant "advanced an irrational and absurd defense" which was "diametrically opposite to the insanity defense raised by defense counsel," because in "no instance could the

12. Indeed, there was adequate support on the record for the trial court's determination of competency even under the pre-Mental Health Act of 1976 standard of "preponderance of the evidence." *See* note 11, *supra*.

Defendant follow counsel's advice on any of the substantive issues; i.e., Fifth Amendment rights, insanity, specific intent, diminished capacity, and the introduction of prejudicial photos ...," and because he did not understand the nature of the proceedings against him but, rather, viewed them as a "means to uncover the conspiracy against him—to unmask the devil." Brief for Appellant at 31–33. We disagree.

As the lower court correctly stated:

Lack of cooperation and the failure to heed counsel's advice and/or the failure to agree with counsel's strategy are certainly not to be equated with and do not establish legal incompetency. *The issue is the Defendant's ability to cooperate and not whether he is actually cooperating. Indeed, as the trial Judge noted, there is a factual and legal distinction between inability to assist and being unwilling to assist.* Defense counsel also contend that Banks' belief that a conspiracy existed against him and that he was going to "unmask the devil" establishes his incompetency. It may well be that Banks actually believed that such a conspiracy existed and that the trial was necessary to establish that fact. On the other hand, Banks may have feigned such a belief in hopes of actually promoting the defense of insanity being raised by his counsel which, on the other hand, he indicated he did not desire to assert. *Whatever Banks' intent or strategy was or whether it comported with his counsel's desires or plans—does not change the fact that he was "legally competent" to stand trial.*

Slip op. at 13–14 (emphasis added).

Appellant clearly demonstrated his *ability* to participate and assist in his defense and his understanding of the nature and object of the proceedings. While presentation of his conspiracy theory was against counsels' advice, his bizarre "defense" did not, as counsel suggests, conflict with his defense of insanity. In fact, his "conspiracy" theory and presentation at trial dovetailed quite nicely with the opinions of the expert psychiatric witnesses for the defense,

who testified that appellant's obsessive and paranoid delusions about racism and race wars prevented him from understanding the nature and quality of his acts and from knowing that his acts were wrong.

Finally, while it does, indeed, appear that appellant viewed his trial as an opportunity to prove his perceived conspiracy to the jury and to the world, there is ample evidence of record to support the court's determination that appellant understood that he was on trial on thirteen counts of homicide, that he could be sentenced to death if convicted, that he would not be sentenced to death if found not guilty by reason of insanity, that he understood the role and functions of the prosecutors, defense attorneys and judge, and that he was able to assist and participate in his defense even though he chose not to cooperate with counsel nor to heed their advice.

For the foregoing reasons, we hold that the lower court did not err in its determination that appellant was competent to stand trial.

Appellant next argues that the court erred in its instructions to the jury on sanity. Appellant's brief states:

> Consideration being given to the inadequacies of *M'Naghten* in Pennsylvania, [the trial] Court produced its own definition of insanity by (1) recognizing that to be insane, the Defendant must be 'completely or totally unable to understand the nature and quality of his act or completely or totally unable to distinguish between right and wrong....' [N.T., Trial Volume VI, p. 2223]; (2) that knowledge of the nature and quality of the act relates merely to a cognitive awareness of the physical act and its consequences; [N.T., Trial Volume VI, pp. 2224–25]; and (3) that 'wrong' means 'legally or morally' with morality reflecting 'societal standards and not those of a particular individual.' [N.T., Trial Volume VI, p. 2225]. In defining *M'Naghten* with consideration being given to the Commonwealth's burden of proof, the Court charged as follows:

'[I]n view of what I have said regarding the legal test of insanity and the Commonwealth's burden of proof, you cannot find the Defendant guilty unless you are satisfied beyond a reasonable doubt that at the time of the acts involved, that is, the killings, the attempted murder and the robbery, either the Defendant had no mental disease or defect, or, if he did have a mental disease or defect, that he was not, as a result of such disease or defect, incapable of knowing what he was doing and of judging that it was wrong to do so. That is the test.' [N.T., Trial Volume VI, p. 2226].

An exception to the Court's charge on insanity was taken by Defense Counsel. [N.T., Trial Volume VI, pp. 2237–38].

Brief for Appellant at 38–39.

■ On appeal, the court's instructions to the jury must be viewed in their entirety and considered as a whole. *Commonwealth v. Zettlemoyer, supra* at 500 Pa. 38, 454 A.2d 937; *Commonwealth v. Tolassi,* 489 Pa. 41, 413 A.2d 1003 (1980). So viewed, we find that the court's instructions fully and adequately delineated the law in this Commonwealth as to legal insanity/criminal responsibility. (The court's entire charge to the jury on the issue of insanity is set forth *infra* as an Appendix to this opinion.)

Appellant's principle challenge to the court's instructions asserts that, under *M'Naghten,* "knowledge" of the nature and quality of the act must entail more than a "cognitive awareness that an act is being committed;" rather, it must also encompass "a rational appreciation as well of all the social and emotional implications involved in the act and a mental capacity to measure and foresee the consequences of the violent conduct." Brief for Appellant at 37, 41. We agree with the Commonwealth that this position amounts to an indictment of the *M'Naghten* standard, and either misperceives the nature of the *M'Naghten* test or seeks to fundamentally alter it. This we shall not do. In *Commonwealth v. Tempest, supra,* we stated that the *M'Naghten* test can and does embrace those mentally disturbed in the

category of those criminally responsible, 496 Pa. at 441, 437 A.2d 952, and is not intended to separate the emotionally disturbed from the emotionally healthy. *Commonwealth v. Demmitt*, 456 Pa. 475, 481, 321 A.2d 627 (1974). And as we said explicitly in *Commonwealth v. Neill*, 362 Pa. 507, 514, 67 A.2d 276, 280 (1949):

> Certainly neither social maladjustment, nor lack of self-control, nor impulsiveness, nor psycho-neurosis, nor emotional instability, nor chronic malaria, nor all of such conditions combined, constitute insanity within the criminal conception of that term.

For the Commonwealth to meet its burden of demonstrating that a defendant is legally sane,[13] it most certainly does not have to demonstrate that he or she has a "rational appreciation as well of all the social and emotional implications" or the ability "to measure and foresee the consequences" of the act. As this Court stated long ago in adopting the *M'Naghten* test in this Commonwealth, "to the eye of reason, every murderer may seem a madman, but in the eye of the law he is still responsible.... [T]o constitute a sufficient defense on this ground there must be an entire destruction of freedom of the will...." *Commonwealth v. Mosler*, 4 Pa. 264, 268 (1849). Contrary to appellant's position, legal sanity is *not* demonstrated by a murderer's appreciation of the social and emotional implications of the killing nor by his ability to measure and foresee all of the consequences of that act, but rather is demonstrated by the murderer's knowledge that he or she has killed and the knowledge that it was wrong. *Commonwealth v. Tempest, supra; Commonwealth v. Zlatovich, supra; Commonwealth v. Demmitt, supra; Commonwealth v. Metzler*, 499 Pa. 122, 123–24, 451 A.2d 1352 (1982).

Appellant challenges the portion of the court's charge which instructs the jury that "you cannot find the

13. Where there is sufficient evidence to raise the issue of sanity, the burden of proof is on the Commonwealth to establish the defendant's sanity beyond a reasonable doubt. *Commonwealth v. Scarborough*, 491 Pa. 300, 305, 421 A.2d 147 (1980).

Defendant guilty unless you are satisfied beyond a reasonable doubt that ... either the Defendant had no mental disease or defect, or, if he did ... that he was *not* ... *incapable of knowing* what he was doing and of judging that it was wrong to do so." Appellant contends that charging the jury that the Commonwealth must prove he was "not incapable of knowing" was erroneous, that the proper phraseology under *M'Naghten* is that the Commonwealth must prove the actor was "able to know," and that this "variation" on *M'Naghten* "ingeniously shifted the burden to the defense to prove insanity" as the "Defendant must be 'able to understand' and not, 'not unable.'" Brief for Appellant at 39–40. We perceive little, if any, significance to the court's use of the phrase "not incapable" as opposed to "able," and we are satisfied that the court's comprehensive instructions to the jury, read in their entirety (*see* Appendix), adequately and accurately conveyed to the jury the law in this Commonwealth regarding legal insanity/criminal responsibility under *M'Naghten,* notwithstanding appellant's quibbles with certain isolated portions of that charge.

■ Before we leave the subject of appellant's mental condition, we wish to make it clear that we are aware that appellant suffers and has suffered from a mental defect that contributed to his bizarre behavior both in the courtroom and on September 25, 1982, when thirteen innocent persons were murdered by his hand. His behavior was inexplicable, and his thought-processes remain difficult to comprehend. However, the incomprehensibility, the bizarreness of someone's behavior, is not, nor can it be, determinitive of his legal sanity or competency to stand trial. A hallmark of society is holding its members accountable for their conduct. In rejecting appellant Weinstein's request that we recognize irresistable impulses as diminishing an actor's ability to form the specific intent to kill, we stated in *Commonwealth v. Weinstein, supra* at 499 Pa. 116, 451 A.2d 1344:

The law, in its effort to shape a rational social policy, grounded in the broadly shared assumptions of the individuals who make up society, cannot admit that acts an individual carefully plans and carries out to advance his own desire, when he knows those acts will result in the death of another human being, will not be punished simply because of the intensity or strangeness of that desire. Such an admission proceeds imperceptibly to the absurd result that the more strange and brutal the act the more likely the actor is to be relieved of its criminal consequences. Along the psychoanalytic continuum the outrageous proves the innocence. In an oddly circular fashion the act establishes its cause as mental illness and the mental illness determines the act. Such analysis may be medically useful. It is not legally useful.

Appellant next contends that the court committed prejudicial error when it permitted the Commonwealth to introduce highly inflammatory photographs of the victims. As previously discussed, the court initially ruled at a suppression hearing on May 13, 1983, that the Commonwealth would not be permitted to introduce photographs of the murder victims. At this hearing, appellant explained to the court why he believed the photographs would be helpful to establish his conspiracy theory. The court cautioned appellant and advised him of the potential prejudice that could result if the photographs were introduced, and further advised him that the remaining photographs might become admissible at trial if he pursued his conspiracy theory. Appellant indicated, and the court found, that he understood the court's advice and the consequences of his tactics.

At trial, appellant did present his conspiracy defense and used some of the photographs of the victims in personally cross-examining Coroner Shavers. An extensive colloquy was conducted in which appellant was readvised of the consequences of his actions and, again, appellant demonstrated his understanding of the court's advice and of the consequences of his strategy. N.T. June 7-8, 1983, at 445-63.

In rebuttal, the Commonwealth recalled the three pathologists who had previously testified and introduced thirty-eight additional photographs of the corpses, over objection by defense counsel. The court gave a cautionary instruction to the jury concerning the photographs, explaining the limited purposes of the photographs and admonishing the jury not to "become emotional" and to "disregard any inflammatory influence that they may have upon you or that you may feel...." N.T. June 18, 1983 at 1946.

■ Under these unusual circumstances, we see no error in admitting the photographs of the corpses to rebut appellant's defense of conspiracy. We recently stated in *Commonwealth v. Garcia*, 505 Pa. 304, 313, 479 A.2d 473 (1984):

The admission into evidence of photographs depicting the corpse of the homicide victim or the location and scene of the crime lies within the sound discretion of the trial judge.... A photograph which is judged not inflammatory is admissible if "it is relevant and can assist the jury in understanding the facts." ... A gruesome or potentially inflammatory photograph is admissible if it is of "such essential evidentiary value that [its] need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." (Citations omitted.)

It is clear that the photographs of the crime victims in this case were of essential evidentiary value to refute appellant's conspiracy theory, and that the court did not err, therefore, in permitting the photographs to be introduced in rebuttal by the Commonwealth.

■ Appellant also asserts that the court erred in several instances in introducing evidence of his prior criminal record and of prior acts of violence which, he claims, unduly prejudiced him. It is, of course, true that evidence of prior crimes and/or acts of violence are inadmissible merely to show the defendant's propensity for violence or bad character. *Commonwealth v. Morris*, 493 Pa. 164, 175, 425 A.2d 715 (1981). However, evidence of prior crimes and violent acts may be admissible in special circumstances where it is relevant for some other legitimate purpose and not merely

to show the defendant's propensity for committing crimes. *Commonwealth v. Claypool* 508 Pa. 198, 204, 494 A.2d 1392 (1985).

█ Accordingly, the general rule prohibiting the admission of evidence of prior crimes nevertheless

allows evidence of other crimes to be introduced to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan or design embracing commission of two or more crimes so related to each other that proof of one tends to prove the others; or (5) to establish the identity of the person charged with the commission of the crime on trial, in other words, where there is such a logical connection between the crimes that proof of one will naturally tend to show that the accused is the person who committed the other.

*Commonwealth v. Morris, supra* at 493 Pa. 175, 425 A.2d 715. This list of "special circumstances" is not exclusive, and this Court has demonstrated it will recognize additional exceptions to the general rule where the probative value of the evidence outweighs the tendency to prejudice the jury. *Commonwealth v. Claypool, supra* (evidence of defendant's prior criminal activity is admissible where defendant makes statement about such activity in order to threaten and intimidate victim and where force or threat of force is element of crime for which defendant is being prosecuted). Such evidentiary issues are addressed to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Id.* With these principles to guide us, we review appellant's specific assignments of error.

█ Appellant contends that the court erred in permitting the Commonwealth to cross-examine Dr. DeWitt Weatherly regarding appellant's previous 1962 conviction and incarceration for armed robbery, assault with intent to kill and other related offenses. Dr. Weatherly testified for the defense regarding appellant's mental condition. As part of appellant's history which he narrated to the jury, Dr. Weatherly stated: "So he returned to the Wilkes-Barre

area in January, 1961. He remained occupationally unsuccessful. Essentially, during the sixties, there were no jobs that one might characterize as fulltime, decent jobs." N.T. June 14, 1983 at 1320. In denying appellant's post-verdict motions, the lower court stated:

> The Commonwealth contends that the testimony of the doctor was false and misleading in that it gave the impression that during the 60's Banks [appellant] was making efforts to secure a full time decent job but he was occupationally unsuccessful. As noted in Bank's brief, "the fact of the matter was that [Banks] was incarcerated during the 1960s and defense did not want to bring this fact before the jury." To allow the jury to infer from the testimony that Banks was leading a normal life during this period would have been unfair to the Commonwealth. Allowing the Commonwealth to cross-examine as to the facts relied upon by the witness in forming his psychiatric opinion was certainly well within the discretion of the trial Judge. We are satisfied that the trial Court properly permitted the Commonwealth to elicit testimony of Bank's incarceration to rebut the impression that he was leading a normal life during the 60's. Certainly, the testimony was not elicited in any attempt to establish Banks' predisposition to commit the crimes charged or to impugn his character.

Slip op. at 10–11. The court instructed the jury at the time that this evidence was to be considered only for the "very limited purpose; that is, for the purpose of assisting you in determining the mental state of the defendant ... on September 25, 1982. . . ." and cautioned the jury that it was not to infer guilt in the instant case because of his prior record. N.T. June 14, 1983 at 1380. Similar instructions were repeated during the court's charge to the jury. N.T. June 21, 1983 at 2196. Under these circumstances, we agree with the lower court that the cross-examination of Dr. Weatherly concerning appellant's prior criminal record and incarceration was admissible for the limited purpose of assisting the jury in assessing the witness' credibility on a crucial and hotly contested issue.

■ The Commonwealth also elicited rebuttal testimony from the Director of the Domestic Violence Service Center regarding Regina Clemens, who had received shelter at the Center from September 4–7, 1982. The director testified that Ms. Clemens intended to reside with her brother when she left the Center, which contradicted appellant's own testimony that Ms. Clemens intended to return and live with him. This testimony was of essential evidentiary value to the Commonwealth in establishing appellant's apparent motive for his rampage on September 15, 1982 and that he had the specific intent to kill. Thus, the court did not err in admitting this testimony even though, as appellant suggests, it contained the implication that Regina Clemens was a prior victim of appellant's violence which caused her to seek help at the shelter.

■ Similarly, the court did not err in allowing a neighbor to testify in its case-in-chief that he observed appellant slapping Susan Yuhas in the week preceding the murders and overheard him state "You're just like your sister Gina. You're going to leave just like her." This testimony supported the Commonwealth's motive theory, and the court did not err in allowing it to be introduced.[14]

**14.** In its opinion denying appellant's post-verdict motions, the court stated:

> We are satisfied that the testimony in question was relevant to the question of motive. It was one of a number of incidents indicating or establishing Banks' desire to secure and/or retain control over his family and his apparent lack of ability to do so. We reject Banks' contention that the claim of motive was conjectural and frail and failed to connect Banks' prior outburst of violent anger against Yuhas to the subsequent killings involved in this case. Such arguments go to the weight of the evidence and not to its admissibility. One cannot always expect to find logical or rational connections between incidents. Why someone would kill 13 people is not easily explained and where evidence, such as this, may well shed light on the reason or purpose and is so closely connected in time, it should not be rejected merely because of some potential prejudice to the Defendant. Considering the nature of the accusations in this case and the facts and circumstances presented, any weighing of the admission of this testimony on the scales of justice falls heavily on the side of the Commonwealth. Accordingly, we find no abuse of discretion in its admission.

Slip op. at 9.

■ Appellant also asserts that the court erred in refusing his request for a mistrial when Detective William Maguire testified that appellant had stated to him he had "some dealings" with the Wilkes-Barre Police Department in the past.[15] N.T. June 9, 1983 at 775. This assertion is without merit. Detective Maguire's passing reference to "some dealings" that appellant may have had with the Wilkes-Barre police in the past did not necessarily or by reasonable implication infer that he had a prior criminal record with that police department, particularly given appellant's occupation as a prison guard at the state correctional institution at Camp Hill. *See Commonwealth v. Carpenter*, 511 Pa. 429 at 435–438, 515 A.2d 531 at 534–35 (1986) and cases cited therein.

■ Appellant challenges his twelve sentences of death imposed by the jury on several grounds.[16] Our standard of review of a judgment of sentence of death is established by the Sentencing Code, 42 Pa.C.S.A. § 9711(h), which provides:

(1) A sentence of death shall be subject to automatic review by the Supreme Court of Pennsylvania pursuant to its rules.

(2) In addition to its authority to correct errors at trial, the Supreme Court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court shall affirm the sentence of death unless it determines that:

**15.** Detective Maguire testified as to appellant's arrest and statements appellant had made at the police station. In the course of his direct testimony, he stated: "He made statements concerning the Wilkes-Barre Police. He said he thought the Wilkes-Barre Police was a nice police department; they weren't racists. He had some dealings with them in the past and...." Defense counsel moved for a mistrial, which was denied. N.T. June 9, 1983 at 775.

**16.** Appellant's final contention of trial error is that the court erred in denying his petition for exhumation of the victims' corpses. There is no merit to appellant's contention as the court acted well within its discretion in denying this petition. *See Commonwealth v. Kivlin*, 267 Pa.Super. 270, 406 A.2d 799 (1979), *allocatur denied* January 30, 1980.

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

The evidence overwhelmingly supports the finding of an aggravating circumstance, since appellant was convicted on twelve counts of murder of the first degree committed at the time of the offenses in issue, each of which carried a sentence of either death or life imprisonment. 42 Pa.C.S.A. § 9711(d)(10). Appellant maintains, however, that the jury's sentencing verdict was against the weight of the evidence and abused its discretion in failing to give "due consideration" to the mitigating circumstances presented. This contention is patently without merit. "Under our legislative scheme, it is exclusively a jury question whether any mitigating factor is to be given determinitive weight when balanced with other mitigating and aggravating circumstances...." *Commonwealth v. Fahy*, 512 Pa. 298, 317, 516 A.2d 689 (1986). The jury performed its exclusive function and acted well within the authority placed upon it by the legislature in determining that the overwhelming evidence regarding the aggravating circumstance before it outweighed the mitigating circumstances it found.

Appellant asserts that the prosecutor made improper remarks during closing arguments at the sentencing phase which require that we vacate the sentences of death and remand for the imposition of life sentences. These remarks were: an incorrect suggestion that the *M'Naghten* standard was applicable in determining appellant's mental illness as a mitigating circumstance, which suggestion was objected to and corrected by the trial court; and a remark, made in response to closing remarks of defense counsel,

that appellant "did it by showing no sympathy or mercy to his victims, and I ask that you show him no sympathy, that you show him no mercy." N.T. June 21, 1983 at 2311. The latter remark was also objected to, with the objection sustained by the trial court. The prosecutor's misstatement regarding appellant's mental condition and emotional state in consideration of mitigating circumstances was promptly corrected and the jury was accurately charged by the trial court, and appellant was not prejudiced thereby. The prosecutor's remarks regarding no mercy or sympathy were within the oratorical license and impassioned argument that this Court has consistently allowed during the sentencing phase, particularly where prompted by remarks of defense counsel. *See Commonwealth v. Whitney*, 511 Pa. 232, 512 A.2d 1152 (1986), and cases cited therein. Accordingly, we find no basis in the prosecutor's closing arguments for disturbing the jury's sentences of death, nor do we find those sentences to have been otherwise "the product of passion, prejudice or any other arbitrary factor."

 The final argument advanced by appellant is that the death penalty constitutes cruel and unusual punishment in this case "as it befalls upon an individual, who, at the time of commission of the crime, was severely mentally ill." Brief for Appellant at 56. We do not agree. Sufficient evidence of record established that appellant was legally sane when he committed the mass slayings and competent to stand trial, and we see no reason why the jury's finding that he had acted under extreme mental or emotional disturbance would render imposition of the death penalty cruel and unusual punishment. This Court recently addressed a similar argument in *Commonwealth v. Fahy, supra,* 512 Pa. at 316–317, 516 A.2d 689, wherein we stated:

> After oral argument, permission was given and supplemental briefs were filed by both parties concerning an inquiry made by this Court during oral argument. The issue underlying this inquiry is whether a finding by the jury in mitigation under 42 Pa.C.S. § 9711(e)(3)—substantial impairment—precludes imposition of the death penal-

ty, notwithstanding the jury's determination that the three aggravating circumstances present outweighed the two factors found in mitigation. We conclude that it does not.

Our review of the death penalty statute, the record and the nature of the common law bar to execution of the death warrant where the condemned prisoner becomes incompetent after conviction convinces us that a jury finding of substantial mental impairment under § 9711(e)(3) does not bar the death penalty imposed by the jury, and that the common law rule has no application here since Appellant is not incompetent.

Appellant was ruled competent to stand trial and for sentencing, and there is nothing in the record to suggest that Appellant is incompetent and should not be executed.... Under our legislative scheme, it is exclusively a jury question whether any mitigating factor is to be given determinative weight when balanced with other mitigating and aggravating circumstances in the case. Our legislature could have provided that a finding of substantial impairment precludes imposition of the death sentence, however, it did not do so. Instead, it determined that this factor was to be weighed by the jury along with all the other factors and that it is within the province of the jury to determine how much weight it should be accorded. We find no basis upon which to disturb the verdict and sentence of the jury.

 Lastly, we are required to review the penalties imposed in "similar cases" to determine whether the sentence of death is excessive or disproportionate to those imposed in such similar cases. Frankly, we have found no "similar cases" to this, a multiple homicide where appellant coldly massacered thirteen people, including the women and children of his extended family. Nevertheless, we have reviewed other cases wherein the jury has found the same aggravating circumstance found by the jury in the instant

case, and find no excessiveness or disproportionality to the sentences imposed in such other cases.[17]

For the foregoing reasons, we affirm the appellant's convictions and his judgments of sentence.[18]

McDERMOTT, J., concurs in the result.

NIX, C.J., filed a dissenting opinion in which ZAPPALA, J., joined.

## APPENDIX

### CHARGE OF THE COURT—INSANITY

BY THE COURT:

In addition, you are instructed that when insanity is asserted as a defense, absence of motive is an appropriate consideration or factor to be employed in the determination of the issue of the defendant's insanity. Just as the presence of motive may be a relevant consideration in determining guilt, the absence of motive is a relevant consideration for you in determining whether the defendant was insane at the time he committed the acts complained of. It is entirely for you to determine what weight should be given the evidence concerning motive, on each of these issues.

Now, ladies and gentlemen, I have defined for you the offenses and some of the general principles of law that apply to the fifteen Informations and the twenty charges before you in this case. The Court has prepared and will furnish you with a verdict form for each Information, which

17. We have reviewed the data and information pertaining to similar cases that has been compiled by the Administrative Office of Pennsylvania Courts pursuant to this Court's directive in *Commonwealth v. Frey*, 504 Pa. 428, 443, 475 A.2d 700, 707–08 (1984), *cert. denied* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984).

18. The prothonotary of the Eastern District is hereby directed to transmit a full and complete copy of all of the records and transcripts of the trial, sentencing and appeal of this case to the Governor, as required by 42 Pa.C.S.A. § 9711(i). Transmittal of this record to the Governor does not, however, "remove the case from the jurisdiction of the courts or prevent further action by the courts." *Commonwealth v. Travaglia*, 502 Pa. 474, 505–06 n. 5, 467 A.2d 288 (1983), *cert. denied*, 467 U.S. 1256, 104 S.Ct. 3547, 82 L.Ed.2d 850 (1984).

form will indicate the charge, a brief summary of what the charge is, and an indication of the possible verdicts.

In this case, one of the possible verdicts is not guilty by reason of insanity. If a defendant was legally insane at the time he committed an act, then the law excuses that act, even if it would otherwise constitute murder. And in such a case, the defendant should be found not guilty by reason of insanity.

In this case, the defendant has asserted the defense of insanity. He has asserted that defense to each of the charges, to all of the charges involved in this case. I want you to know that the fact that the defendant asserts the defense does not mean that he has the burden of proving that he is insane. Indeed, when a defense of insanity is raised, as in this case, in addition to proving all of the elements I have outlined for each offense beyond a reasonable doubt, the Commonwealth is also required to prove the defendant's criminal responsibility beyond a reasonable doubt. That is, the Commonwealth must prove beyond a reasonable doubt that the defendant was not insane at the time of the alleged crime.

The term "insanity" has a very special meaning in the criminal law. As you know now from the evidence, there are a number of tests or standards employed in different states for determining sanity, or, stated otherwise, for determining if a person is legally insane. Pennsylvania employs what is known as the *M'Naghten* test, while, as you heard, for instance, the State of Maryland employs a modified version of the American Law Institute standard. In addition to these two tests, there are other tests, such as the irresistible-impulse test. In this state, we have rejected all other tests and standards and we employ only one, and that is the *M'Naghten* test.

I think everyone would agree that the acts involved in this case were not the product of a sound mind. The defendant in this case suffered from paranoia, but I hasten to add that mental disease or defect alone does not and cannot absolve a defendant from criminal responsibility.

The *M'Naghten* test employed in this Commonwealth is a legal test. It is not a medical or theological test. Accordingly, the terms of the test are legal and the definition of those terms is a matter of law upon which you must follow my instructions. Our courts have declared, on many occasions, that neither social maladjustment nor lack of self-control, nor impulsiveness, nor psychoneurosis, nor emotional instability, nor all of such conditions combined constitute insanity within the criminal conception of that term. Abnormal conditions which medical science might regard as mental illness do not necessarily amount to what the law regards as insanity, in this state.

The legal test or definition of "insanity" in the Commonwealth of Pennsylvania is this:

A person is insane if, at the time of committing an act, he is, as a result of mental disease or defect, unable to understand the nature and quality of his act or to distinguish between right and wrong with respect to that act.

Stated more simply, a person is insane if, at the time of committing an act, he is, as a result of mental disease or defect, either incapable of knowing what he is doing, or, if he does know what he is doing, is incapable of judging that it is wrong to do so.

The term "mental disease or defect" in this test means a disease or infirmity of the mind, as distinguished, for example, from a mere fault of character, temperament or social adjustment.

I would also advise you that under the Pennsylvania test for insanity, a defendant either understands the nature and quality of his acts or he does not. He is either able to distinguish between right and wrong or he is not. The test in Pennsylvania, unlike Maryland, where they absolve a defendant who lacks substantial capacity, recognizes no degree of incapacity. To be legally insane, the defendant must be completely or totally unable to understand the nature and quality of his act, or completely and totally unable to distinguish between right and wrong.

You should also know and remember that Pennsylvania rejects any defense that a defendant felt compelled or couldn't stop himself from committing the acts or acted as a result of an irresistible impulse to kill. Any such defense cannot be accepted and cannot be the basis for a finding of insanity, in this Commonwealth or in this case. If insanity is to be the basis for a verdict of not guilty by reason of insanity, it must be legal insanity under the test as I have outlined it for you.

Did George Banks suffer from a mental disease or defect on the morning of September 25, 1982? Did George Banks know what he was doing on that morning? And if he did know what he was doing, was he capable of judging, at that time, that it was wrong to do so?

Your first inquiry must be to determine whether or not the defendant suffered from a mental disease or defect on that date. If you decide that he did, you will then consider what is often referred to as the two-pronged test of *M'Naghten*.

The first element of the test is knowledge, in the sense of awareness of the nature and quality of the act. It encompasses the ability of an accused to comprehend what he is doing. The words "know the nature" refer to the ability of a person to be aware of the physical characteristics of his act. If the accused knew that he was doing the act, shooting, the true character of his activity, then he knew the nature of his acts.

Knowledge of the quality of the act refers to the ability to comprehend its harmfulness. This is sometimes described as knowledge of the consequences of the act. If the accused understood that shooting would cause serious bodily injury and possibly death, he understood the quality of his acts.

The second element of the test is that the defendant be incapable of distinguishing between right and wrong with respect to that act. That is, he was incapable of judging that it was wrong to do so.

An individual is unable to tell right from wrong with reference to the particular act charged if, at the time of the commission of the offense, he is unable to tell that his act is one which he ought not to do. If the accused knew his act was wrong, either legally or morally, then he cannot be excused for his crime, on this part of the test for insanity.

Morality here would reflect societal standards and not those of a particular individual.

An accused's knowledge that an act is illegal will permit the inference of knowledge that the act is wrong, according to generally accepted moral standards of a community.

In determining the question of insanity, you should consider all the evidence, including the testimony of witnesses regarding the acts, words, conversations, behavior and appearance of the defendant before, at, and close to the time of the alleged crime, as well as the testimony of the expert witnesses and testimony of the witnesses concerning the defendant's general mental condition.

The critical time when insanity must exist in order to be a defense is at the time when the alleged criminal act was committed. You have heard the evidence concerning the defendant, beginning many years prior to and at the time of and close to the acts, as well as some evidence concerning events and occurrences after the offenses involved. Although you may consider evidence of the defendant's mental condition before and after the time the offenses were committed, you may consider it only to help you decide or determine his sanity and state of mind at the time of the alleged crimes.

In view of what I have said regarding the legal test of insanity and the Commonwealth's burden of proof, you cannot find the defendant guilty unless you are satisfied beyond a reasonable doubt that at the time of the acts involved, that is, the killings, the attempted murder and the robbery, either the defendant had no mental disease or defect, or, if he did have a mental disease or defect, that he was not, as a result of such disease or defect, incapable of

knowing what he was doing and of judging that it was wrong to do so. That is the test.

NIX, Chief Justice, dissenting.

Although I have serious problems with the trial court's determination that the appellant had the mental competence to stand trial, my dissent from the majority opinion is based on another ground. In my view the trial court, by allowing appellant to put before the jury the gruesome photographs of the infant victims' bullet-torn bodies, permitted him to convert the system of criminal justice into an instrument for his self-destruction.

The appellant's court-appointed lawyers had advised him not to take the witness stand; yet, he elected to disregard their advice. Although the appellant had every right to give testimony in his own behalf, he went beyond that. The appellant took it upon himself to introduce in evidence, for the purpose of trying to establish a preposterous theory of a conspiracy against him, photographs of the dead victims. Those pictures were so horrible and evocative, so inflammatory in their nature, that the trial court had previously ruled them inadmissible. The judgment as to which exhibits will be introduced into evidence is a function to be performed by a competent trial counsel. *See Commonwealth v. Bell,* 442 Pa. 566, 276 A.2d 834 (1971). The conclusion is therefore inescapable that when the appellant on his own, over the strenuous opposition of his counsel, put the photographs before the jury, he was acting as his own attorney and was representing himself. He had, at that point, superseded appointed trial counsel as to the stewardship of the case.

It is true that the United States Supreme Court, in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), held that a criminal defendant has a constitutional right to represent himself. The Court, however, cautioned that, "[a]lthough a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages

of self-representation, so that the record will establish that *'he knows what he was doing* and his choice is made with eyes open.'" *Id.* at 835, 95 S.Ct. at 2541 (emphasis added). The Court also observed that a defendant's right to act as his own lawyer was not a license to abuse the dignity of the judicial process. *Id.* at 834 n. 46, 95 S.Ct. at 2541 n. 46.

The record in the instant case clearly portrays the appellant as a person suffering from a severe mental disorder, if not at the time of the crime itself, then certainly during the trial. The truth of that conclusion is made even more compelling by the absurdity of his conspiracy theory and his proposal to establish it with exhibits which could do nothing but prejudice his case. Despite the trial court's finding that the appellant was competent to stand trial, his paranoiac utterances and ramblings before the judge should have left no doubt in the mind of the court as to his inability to undertake any part of his representation.[1]

Other jurisdictions have considered the issue of the power or even the duty of a trial judge to prevent a criminal defendant from representing himself in certain circumstances. For example, in *People v. Burson,* 11 Ill.2d 360, 143

---

**1.** Prior to appellant's taking the witness stand and introducing the photographs, a colloquy took place between him and the trial judge. During that exchange the appellant made remarks such as: "I can show that there is a conspiracy against me. I can prove it with material fact, right here in this courtroom today.... This is the only shot I got to pull the mask off the face of the Devil, and I intend to do it.... I sat up here, sir, for eight days and listened to nothing but hypocrisy, lies and corruption and coerced and perjured testimony. I don't see where I can hurt myself.... I don't have a chance anywhere in this nation ... this trial is a farce.... I've been bullied enough." Following the last remark, the trial judge stated that he would not tolerate "testimony" of that kind. T.T. 1639–1642.

In response to the court's rebuke the appellant replied: "Well, then, I'll take my best shot and go with what I got. Can I get *my* photographs and stuff?" The judge answered, "you certainly may." T.T. 1642. At that point, defense counsel asked the court to determine again the appellant's mental competency, stressing the utter absurdity of the conspiracy theory. The trial judge denied the motion, and in doing so said: "It *may well be that he believes that. It may well be, as they say, part of his delusion.* If that is so, it doesn't seem to me *you're* hurt." T.T. 1643. This last statement addressed the concern of defense counsel that the conspiracy theory would make *them* "look like a bunch of monkeys."

N.E.2d 239 (1957), the Supreme Court of Illinois was confronted with the problem of self-representation by a defendant whose sanity was seriously in doubt. The Court concluded that even if the defendant was sane at the time of trial, his right to represent himself was subject to the constant duty of the court to protect the judicial process from inadequate and improper conduct of the defense. The Court further held that such a duty included the broad discretion to supersede the defendant's conduct of his own defense.

Along similar lines was the thinking of the Supreme Court of Washington in the case of *State v. Kolocotronis*, 73 Wash.2d 92, 436 P.2d 774 (1968). There, that Court stated the following: "Even though a defendant demands his constitutional right to act as his own counsel, if the court determines that he does not have ... adequate mental competency to act as his own counsel, then his right to a fair trial and his constitutional right to due process of law, [are] disregarded if the court permits him to so act in a criminal case." *Id.* at 97–100, 436 P.2d at 779–80.

As I read the record in this case the trial court, in allowing the appellant to introduce the photographic exhibits, gave no consideration to his questionable mental state at the time. Even assuming the validity of the initial judgment of the court that appellant was competent to stand trial, that judgment did not relieve the court of the responsibility of assuring that the proceedings were in accordance with a fair trial. Moreover, the United States Supreme Court in *Westbrook v. Arizona*, 384 U.S. 150, 86 S.Ct. 1320, 16 L.Ed.2d 429 (1966), in a unanimous per curiam opinion stated:

> Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense. 'The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in

which the accused—whose life or liberty is at stake—is without counsel. This *protecting duty* imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.' *Johnson v. Zerbst*, 304 US 458, 465 [58 S.Ct. 1019, 1023, 82 L.Ed. 1461]; *Carnley v. Cochran*, 369 US 506 [82 S.Ct. 884, 8 L.Ed.2d 70].

*Id.* at 150, 86 S.Ct. at 1320 (emphasis added).

Although counsel for the defense were physically present, the court permitted Banks to waive the assistance of counsel when appellant was permitted to introduce this evidence and to make these highly prejudicial comments over the strenuous objection of both defense counsel. Such an action in my judgment constitutes a waiver of counsel without the court's exercising its "protecting duty."

For the reasons set forth herein, I am constrained to conclude that the trial judge, in allowing the defendant to introduce the prejudicially inflammatory pictures, did not perform his constitutional protecting duty of attempting to ensure that the waiver of counsel was intelligently and knowingly made. As a consequence, this record reflects that a mockery was made of justice.

This action is justified by the Commonwealth by suggesting that this bizarre conduct was merely a strategem by Banks to convince the jury he was insane. It is quite true that one can feign insanity by acting in a bizarre manner. However, it is equally true that one mentally disturbed is quite likely to act in a bizarre manner. The court should have sought expert medical assistance in determining in this instance which was the case. Such a request was made by defense counsel and refused by the court.

As former Chief Justice Burger observed in his dissenting opinion in *Faretta v. California*, the trial judge is "charged with the duty of insuring that justice, in the broadest sense of that term, is achieved in every criminal trial." 422 U.S. at 839, 95 S.Ct. at 2543. That goal, according to Chief Justice Burger, "is ill-served, and the integrity of and public confidence in the system are under-

mined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel." *Id.* Going further, Chief Justice Burger said, "[t]he damage thus inflicted is not mitigated by the lame explanation that the defendant simply availed himself of the 'freedom to go to jail under his own banner.'" *Id.*

I therefore dissent and would vacate the judgments of sentence.

ZAPPALA, J., joins this dissenting opinion.