J-A02038-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AJANAY WATSON | : | |
| | : | |
| Appellant | : | No. 1209 WDA 2021 |

Appeal from the Judgment of Sentence Entered August 10, 2021
In the Court of Common Pleas of Allegheny County
Criminal Division at CP-02-CR-0012596-2019

BEFORE:   BOWES, J., MURRAY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY MURRAY, J.:                    **FILED: FEBRUARY 22, 2023**

Ajanay Watson (Appellant) appeals from the judgment of sentence imposed after the trial court found her guilty of robbery of a motor vehicle, criminal attempt (to commit robbery of a motor vehicle), firearms not to be carried without a license, theft by unlawful taking, simple assault, and fleeing or attempting to elude a police officer.[1]  Appellant claims the trial court erred in discrediting her defense that she was legally insane when she committed the crimes.  We affirm.

Appellant stipulated to the facts at her non-jury trial, which the trial court summarized as follows:

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 3702(a), 901(a), 6106(a)(1), 3921(a), 2701(a)(3); 75 Pa.C.S.A. § 3733(a).

[O]n October 8, 2019, Dana Wallace [(Wallace or Ms. Wallace)] was sitting in her vehicle in the parking lot of a Sunoco gas station when [Appellant, a pedestrian,] opened [Wallace's] passenger door and got into the passenger seat. [Appellant] said "you don't remember me, do you?" [Appellant then] left when Wallace told [Appellant] to get out of her vehicle. Later[,] Kelly Remmy [(Remmy or Deputy Remmy)], an off-duty Allegheny County Deputy Sheriff, was sitting in her vehicle at a traffic light at the intersection of Borland Street and East Liberty Boulevard in the East Liberty section of the City of Pittsburgh. There was one vehicle in front of [Remmy] at the red light[;] that driver was also an off-duty police officer, City of Pittsburgh Officer Christine Mitchell. … [According to Deputy Remmy, Appellant approached her car on foot, while] grabbing at her waist in a manner that someone would when trying to conceal a firearm. Deputy Remmy attempted to pull away from [Appellant] by pulling forward into the intersection, but [Appellant] persisted. Deputy [Remmy pointed] her firearm [at Appellant] from inside the vehicle. [Appellant] then fled on foot.

While officers were on the scene taking the report [of an] attempted carjacking of Remmy's vehicle[,] they received a call about a successful carjacking on Beatty Street.[2] James McLaughlin had parked his 2016 Subaru Forester behind [the nearby] Obama Academy and was waiting to pick up his daughter when [Appellant] jumped into his passenger seat, pointed a black handgun [at] his face and told him to "get the fuck out." He left the vehicle and ran inside the Obama Academy to call 911. With[in] 10 minutes[,] Officers located [Appellant] driving McLaughlin's 2016 Forester in the Homewood section of the [City of Pittsburgh,] and attempted a traffic stop. [Appellant] fled [in the vehicle] and led police on a chase into the Penn Hills neighborhood[,] where she crashed the vehicle. Police recovered a Smith & Wesson M&P 40 caliber pistol on the front driver's side floor of the vehicle. [Appellant] was taken into custody and waived her right to remain silent. [Appellant] gave a recorded [video] statement to police regarding the incidents that was admitted into evidence.

_____

[2] Beatty Street runs parallel beside Borland Street. *See* Affidavit of Probable Cause, 10/8/19, at 2.

In [Appellant's police] statement[,] she told detectives that the gun never had a magazine in it. [Appellant claimed she] obtained [the gun] by breaking into a car and [stated] that she carries it for protection. [Appellant claimed she could not] remember [exactly] where she got [the gun] or how long ago, but that it had not been a very long time. When [police] asked [Appellant] about the incident with Ms. Wallace (the [first] incident)[, Appellant] stated that she did not know [Ms. Wallace, and that Appellant's] intention was to take [Ms. Wallace's] car but [Ms. Wallace did not] cooperate. After that incident[, Appellant told police, she] went into the street trying to stop cars. [Appellant] ran up the street to Deputy Re[m]my's car. [Appellant] smiled and even laughed [during the police interview] when [Appellant] stated that she did not realize that [Deputy Remmy] was a police officer. [Appellant told the police that she] then ran down the street to the Obama Academy middle school[,] where she pointed the gun at James McLaughlin and stole his vehicle. [Appellant] stated that she decided she was going to steal a car that day because she couldn't get a job. She stated that she didn't want to get caught, didn't plan on getting caught, and was tired of being on the street. [Appellant] was cooperative and polite during the interview.

Trial Court Opinion, 2/22/22, at 2-3 (footnote added); *see also* N.T., 8/4/21, at 17-18 (Appellant stipulating to facts).

The Commonwealth charged Appellant with the aforementioned crimes, as well as receiving stolen property[3] (RSP) and driving without a license.[4] Prior to trial, Appellant's counsel filed a Notice of Mental Infirmity Defense. Appellant stated her intention to present at trial expert testimony from Sara West, M.D. (Dr. West), a board-certified psychiatrist. According to Appellant,

Dr. West specifically maintains that as a result of [Appellant's] schizophrenia, at the time of the commission of the offenses, she

---

[3] 18 Pa.C.S.A. § 3925(a).

[4] 75 Pa.C.S.A. § 1501(a).

- 3 -

did not know the nature and quality of the acts she was doing or, if she did know the quality of the acts, that she did not know what she was doing was wrong.

Notice, 3/1/21, at 1-2; *see also* Stipulation to Supplement Certified Record, 7/19/22, Ex. A (Dr. West's report).

The Commonwealth filed a Reciprocal Notice Regarding Mental Health Defense, notifying Appellant of its intent to present at trial expert testimony from Bruce Wright, M.D. (Dr. Wright). Reciprocal Notice, 6/30/21, at ¶¶ 5-7. "Dr. Wright evaluated [Appellant] on May 15, 2021" and thereafter issued a report. *Id.* at ¶ 8; *see also* Stipulation to Supplement Certified Record, 7/19/22, Ex. B (Dr. Wright's report).

The trial court convened a stipulated non-jury trial on August 4, 2021. The defense's case consisted solely of Dr. West's expert testimony in support of Appellant's legal insanity defense. The Commonwealth presented expert testimony from Dr. Wright. Both Dr. West and Dr. Wright testified to Appellant being diagnosed with schizophrenia. N.T., 8/4/21, at 21-22, 36, 71. However, the experts disagreed as to whether Appellant understood the wrongfulness of the crimes she committed. *See id.* at 37.

Prior to issuing its verdict, the trial court stated:

[T]here's no doubt [Appellant] is mentally ill, and as the parties acknowledge … [Appellant] understood the nature and quality of her actions. **The only question is whether or not [Appellant] understood the wrongfulness of her actions.**

* * *

- 4 -

It's always difficult when people are suffering from mental illness, because it's kind of … an explanation or a reason for … why we're here ….  It kind of puts you in a position where you're … struggling to understand why people act in a manner that you just can't explain.

Particularly in [Appellant's] case, when [she] was making her statement to the police, they were repeating over and over how cooperative and respectful [Appellant] was with them….

\* \* \*

But the one thing that I kept noting to myself was [Appellant] was at times tearful.  At one point[, the police] handed her tissues or paper towels[.] … And I noted … [the police] kept trying to specifically ask her … why this occurred.  And I noted [Appellant] had said that she figured why not?  I can't find a job, no one will hire me, and I needed to get to Penn Hills.

And it struck me, at least in [Appellant's police] interview, that when I was processing the things that both … Dr. West and Dr. Wright [testified to], … **[Appellant] seemed to understand the wrongfulness of her actions when she was being interviewed by the police that day.**

So I cannot say that the defense is able to establish at least that [Appellant] did not understand the wrongfulness of her actions on that day, and it seemed she did.

So I agree with [the Commonwealth] that **although [Appellant] is clearly severely mentally ill, [she] was not legally insane on th[e] date [of her arrest]**.

N.T., 8/10/21, at 13-16 (emphasis added).

The trial court convicted Appellant of the aforementioned crimes, and acquitted her of RSP.[5] Appellant waived her right to a pre-sentence investigation report, and the court immediately sentenced her to an aggregate seven years of probation. The court imposed as a condition of probation that Appellant "comply with [her] mental-health treatment and, if deemed appropriate, have an updated mental-health evaluation and comply with any recommendations." N.T., 8/10/21, at 23.

On August 26, 2021, Appellant filed a counseled "Emergency Petition Requesting Permission to File Post-Sentence Motion *Nunc Pro Tunc*." The trial court granted relief, and Appellant filed a motion raising a single claim challenging the weight of the evidence. The trial court denied Appellant's motion and this timely appeal followed.[6] Appellant and the trial court have complied with Pa.R.A.P. 1925.

_____

[5] The Commonwealth withdrew the charge of driving without a license. N.T., 8/10/21, at 23-24 (Commonwealth stating its desire to withdraw the charge to avoid the imposition of a $200 fine on Appellant, who was indigent).

[6] The filing of a post-sentence motion *nunc pro tunc* may toll the appeal period if two conditions are met:

> First, within 30 days of imposition of sentence, a defendant must request the trial court to consider a post-sentence motion *nunc pro tunc*. The request for *nunc pro tunc* relief is separate and distinct from the merits of the underlying post-sentence motion. Second, the trial court must expressly permit the filing of a post-sentence motion *nunc pro tunc*, also within 30 days of imposition of sentence.

***Commonwealth v. Capaldi***, 112 A.3d 1242, 1244 (Pa. Super. 2015) (citations and emphasis omitted). Here, both conditions have been met. ***Id.***

Appellant presents a single issue for review: "Whether the trial court erred by finding [A]ppellant failed to prove that she was legally insane at the time of her illegal acts?"  Appellant's Brief at 3.

In reviewing this issue,

we evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving it the benefit of all reasonable inferences to be drawn from the evidence.  Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt.  Any doubt about the defendant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.  Additionally, the Commonwealth may sustain its burden solely by means of circumstantial evidence.

*Commonwealth v. Lake*, 281 A.3d 341, 346 (Pa. Super. 2022) (citations and quotations omitted).

The defense of insanity is defined by statute:

**(a) *General rule.* —** The mental soundness of an actor engaged in conduct charged to constitute an offense shall only be a defense to the charged offense when the actor proves by a preponderance of evidence that the actor was legally insane at the time of the commission of the offense.

**(b) *Definition.* —** For purposes of this section, the phrase "legally insane" means that, at the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he [or she] was doing or, **if the actor did know the quality of the act, that [s]he did not know that what [s]he was doing was wrong**.

18 Pa.C.S.A. § 315 (emphasis added).  Our Supreme Court has defined "preponderance of the evidence" as "tantamount to a more likely than not

- 7 -

inquiry." ***Samuel-Bassett v. Kia Motors Am., Inc.***, 34 A.3d 1, 35 (Pa. 2011) (citation omitted); ***see also Commonwealth v. Rabold***, 951 A.2d 329, 341 (Pa. 2008) ("the placement of the burden with the defendant to prove insanity by a preponderance of the evidence does not offend constitutional norms.").

This Court has explained:

> To plead the defense of insanity suggests that the defendant committed the act, but was not legally culpable. An insanity defense focuses upon a defendant's capacity, at the time of the offense, to understand the nature and quality of h[er] actions or whether [s]he knew that h[er] actions were wrong. It has long been accepted that **criminal defendants may be presumed sane for purposes of determining their criminal liability**. Thus, under the clear language of section 315(a), the burden of proving insanity by a preponderance of the evidence is upon the defendant. Moreover, we have long stated that the Commonwealth can prove an accused's sanity not only by psychiatric testimony but also by lay testimony which shows that he or she knew the nature and quality of the act committed and knew that what had been done was wrong. Furthermore, **it is within the factfinder's right to disbelieve an insanity defense** and credit the testimony of the eyewitnesses.

***Commonwealth v. Yasipour***, 957 A.2d 734, 738-39 (Pa. Super. 2008) (emphasis added; citations and break omitted).

Appellant argues the trial court erred in rejecting her insanity defense because she established by a preponderance of the evidence that her mental health condition made her "unable to distinguish moral right from wrong at the time of commission of her acts." Appellant's Brief at 27 (bold emphasis

omitted).[7]  Appellant contends she was "under the influence of a 'delusion or hallucination, controlling [her] will,' which was 'so great as [to] entirely [] destroy [her] perception of right [and] wrong.'"  *Id.* at 32-33 (quoting *Commonwealth v. Mosler*, 4 Pa. 264, 266 (1846)).  According to Appellant, "no Pennsylvania court has expressly held whether the word 'wrong' contained in Section 315(b) refers to a moral wrong or a legal wrong."  *Id.* at 24. Appellant asserts the "statute's definition of 'wrong' must be an individual's inability to sort what is morally right from wrong; not legal literacy but the lack of a conscience."  *Id.* at 26 (emphasis omitted); *see also id.* at 33 (complaining the "Commonwealth's evidence focused on [Appellant's] ability to discern legal wrong, 'trouble,' and her ability to connect cause and effect." (underline in original)).  Appellant claims, "Evidence of [Appellant's] account of what happened on October 8, 2019, made clear that she was barely acting with any will of her own, let alone someone with the capacity to make moral judgments."  *Id.* at 27.  Appellant relies on the expert report and testimony of Dr. West.  *Id.* at 27-28, 31; *see also id.* at 33-38 (challenging Dr. Wright's contrary expert testimony and report).

The Commonwealth defends the trial court's rejection of the insanity defense, claiming Appellant failed to meet her burden of proving her mental

---

[7] As stated above, Appellant does not dispute that she understood the nature and quality of her actions when she committed the crimes.  Appellant's Brief at 23; N.T., 8/4/21, at 37; *see also* 18 Pa.C.S.A. § 315(b), *supra*.

health caused her to be unable to understand the wrongfulness of her acts. *See* Commonwealth's Brief at 9-20. The Commonwealth relies on the report and testimony of its expert, Dr. Wright. *Id.* at 12-14. The Commonwealth challenges Dr. West's description of Appellant "as acting out of a primal instinct to survive," which the Commonwealth claims has "no basis in the record." *Id.* at 14; *see also id.* (arguing trial court, as fact-finder, "was free to accept the testimony of Dr. Wright and reject the explanations offered by Dr. West."). The Commonwealth counters, "Instead, the record revealed [A]ppellant was methodical in achieving her ends by wrongful means and that she was aware of the consequences of such wrongful actions." *Id.* The Commonwealth emphasizes that when "faced with the potential consequences, [A]ppellant decided that she did not want to get in trouble for her wrongful actions and immediately fled police." *Id.* at 16 (footnote omitted). Finally, the Commonwealth claims "Appellant makes no argument, and the Commonwealth submits that she cannot, that she believed she was morally justified in her actions despite knowing they were contrary to the law or public morality." *Id.* at 16 n.2. Upon review, we agree.

Dr. West testified for the defense that she conducted a psychiatric examination of Appellant shortly after her arrest. N.T., 8/4/21, at 19. Dr. West stated Appellant has "a long history of mental illness," "had multiple hospitalizations brought about by her family members who went through an involuntary emergent process," and "has been treated with appropriate

medications for the diagnosis of schizophrenia." *Id.* at 21, 22. Dr. West

testified: "I am of the opinion that **[Appellant], because of her mental**

**illness, did not know the wrongfulness of her actions** on the date of …

October 8th, 2019." *Id.* at 29 (emphasis added). Dr. West expounded on her

reasons for this conclusion:

> [O]n the day of the incident, … [Appellant] was experiencing multiple symptoms that would have been associated with schizophrenia. She describe[d] hallucinations that were consistent with schizophrenia, she noted that she was hearing stuff, quote, unquote, and that she had command auditory hallucinations to take vehicles, noting [the hallucinations] were quite powerful, to the point where they were overwhelming.
>
> [Appellant] also had visual hallucinations. When she was looking at a vehicle, she described it as being sparkly. That suggests that her perception of reality was altered at that time.
>
> [Appellant] also described delusional thinking. Delusions are a primary symptom of schizophrenia. She felt that she was indestructible or invincible, that she could do whatever she wanted that day.
>
> * * *
>
> [Appellant] also demonstrated disorganization, another hallmark of schizophrenia, on this date. The evidence to suggest that was [Appellant] attempted to take multiple vehicles in a disorganized fashion. By that I mean that she did this without a plan, without the cover of darkness. There were multiple things that she could have done to engage in this in a much more organized plan or fashion.
>
> [Appellant] also made some nonsensical statements to the police, such as going to her mother's house for Wi-Fi, which in retrospect [Appellant] said made no sense to her. And, further, in [Appellant's] video recorded [statement] when she was discussing the matter with the police, she acknowledged that she had been answering to the wrong name the entire time. They called [Appellant] Nicole, that happens to be her middle name, but

- 11 -

[Appellant] did not correct them until much later in her interactions with them.

[Appellant] also noted that her psychiatric medications, while she was compliant with them at the time of this event, were not working and that her care providers were actually attempting to find the right medication.

*Id.* at 22-24; *see also id.* at 26 (Dr. West stating Appellant's actions in the videotaped interview were "associated with schizophrenia," including Appellant's "poor eye contact, a flat affect, [and] odd emotional responses").

Dr. West further disagreed with Dr. Wright's expert opinion as to Appellant's awareness of the "wrongfulness" of her actions:

We disagree. So Dr. Wright puts forth the idea that simply fleeing from the police would suggest knowledge of wrongfulness. My take on that is that one is going to flee when one feels one's life is in danger. That is simply self-preservation, not a higher level of acknowledging and accepting wrongfulness or considering wrongfulness, rather.

* * *

The police noted [Appellant's] confusion [during her interview], and I really think in this complete fog of schizophrenia and symptoms that [Appellant] was confused and did not have the opportunity to even consider wrongfulness when she was responding to so much internal stimulation.

[Appellant] did continue these attempts even despite being confronted with a weapon by an off-duty police … officer. [Appellant] had no rational motive for attempting any of these things. She had a ride that day. She didn't need a ride anywhere. … She doesn't have a driver's license to drive a car. And she really had no logical destination where she was headed.

[Appellant] didn't make any great effort to avoid detection in that she did this in broad daylight, [and] she cooperated with the police upon arrest….

- 12 -

*Id.* at 30-31.

On cross-examination, Dr. West indicated flight by an accused "is not exclusively an indication that someone knows what they are doing is wrong." *Id.* at 45; *see also id.* at 46 (Dr. West stating Appellant "did know that she was fleeing" police before her arrest); *cf. Commonwealth v. Perez*, 220 A.3d 1069, 1078 (Pa. Super. 2019) (*en banc*) (flight from the scene of a crime can constitute circumstantial evidence of consciousness of guilt). Dr. West further conceded "a well-orchestrated plan is not a requirement" for an accused to be aware of the wrongfulness of her actions. N.T., 8/4/21, at 55.

To the contrary, Dr. Wright testified for the Commonwealth, stating: "It is my opinion [Appellant] did know the wrongfulness of her actions at the time of this offense." *Id.* at 74. In response to the prosecutor asking, "What specifically stands out to you in … forming your opinion?", Dr. Wright answered:

> That opinion is based on a number of factors. [Appellant] told me … after the second attempted … carjacking, **[Appellant] didn't want to get in trouble, she was trying to get away from the police, and she said during her police interview that she did not want to go to jail and did not dispose of the weapon because she did not think she would get caught.**
>
> To me, those [statements] all indicate [Appellant] knew that what she was doing was wrong. People who don't do something wrong don't go to jail. People who don't do something wrong don't think they're going to get caught. That is what that is based on.
>
> So in contrast to Dr. West, who felt it was for [Appellant's] self-preservation [that Appellant] was getting away, … it's my opinion based on the information I reviewed that [Appellant] was

- 13 -

trying to flee because she knew she would get in trouble, as she told me.

*Id.* at 74-75 (emphasis added); *see also id.* at 76 (Dr. Wright stating, "it's my opinion **[Appellant] was fleeing because she had done something wrong, *despite psychiatric factors*.**" (emphasis added)). Dr. Wright expressed his disagreement with Dr. West "on the ultimate opinion. [Dr. West] thinks this was disorganized behavior. I think it was behavior that was a result of [Appellant's] desire not to get caught because she knew she was wrong." *Id.* at 77.

> In rejecting Appellant's insanity defense, the trial court stated:
>
> This court[, as fact-finder,] carefully considered the testimony of both doctors, their expert reports, and all of the evidence submitted at trial. The Commonwealth established beyond a reasonable doubt that [Appellant] committed the crimes with which she was charged. I was also convinced [Appellant] had the capacity to conform her conduct to the requirements of the law. I further found [Appellant] not only had the capacity to understand the wrongfulness of her conduct, but that she did understand the wrongfulness of her conduct despite the fact that she suffers from schizophrenia.

Trial Court Opinion, 2/22/22, at 5.

The trial court's reasoning is supported by the record and prevailing law. We thus discern no abuse of discretion by the trial court in finding Appellant failed to prove her insanity defense by a preponderance of the evidence. *See id.*; *see also Yasipour*, 957 A.2d at 739 (fact-finders are free to reject or accept an insanity defense), and *Commonwealth v. Sanchez*, 262 A.3d 1283, 1288-89 (Pa. Super. 2021) ("it is not the function of the appellate court

to substitute its judgment based on a cold record for that of the trial court. **The weight to be accorded conflicting evidence is exclusively for the fact finder**, whose findings will not be disturbed on appeal if they are supported by the record." (emphasis added; citations omitted)).

Further, we are persuaded by the Commonwealth's argument that,

> to the extent [A]ppellant acknowledges that she knew her acts were illegal, such knowledge supports the logical inference of awareness that society also deems that act to be immoral. In ***Commonwealth v. Banks***, 521 A.2d 1 (Pa. 1987), our Supreme Court found no error in the following jury instructions by the trial court:
>
> > An individual is unable to tell right from wrong with reference to the particular act charged if, at the time of the commission of the offense, he is unable to tell that his act is one which he ought not to do. **If the accused knew his act was wrong, either legally or morally, then he cannot be excused for his crime** … [under] the test for insanity.
> >
> > Morality here would reflect societal standards and not those of a particular individual. **An accused's knowledge that an act is illegal will permit the inference of knowledge that the act is wrong, according to generally accepted moral standards of a community.**
>
> ***Banks***, ***supra***, 521 A.2d at 22-23[] (Emphasis added) [(superseded by statute on other grounds, as stated in ***Commonwealth v. Jermyn***, 709 A.2d 849, 855 (Pa. 1998)).]

Commonwealth Brief at 17; ***see also id.*** (citing ***Commonwealth v. Bruno***, 407 A.2d 413, 416 (Pa. Super. 1979) (stating the standard for insanity "is a legal test, not a medical or theological one.")).

Accordingly, the trial court did not err or abuse its discretion in rejecting Appellant's insanity defense and claim to the contrary lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  2/22/2023