J-S14036-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JONATHAN FERNANDO RODRIGUEZ- | : | |
| QUIJANO | : | |
| | : | No. 1487 MDA 2025 |
| Appellant | : | |

Appeal from the Judgment of Sentence Entered January 24, 2019
In the Court of Common Pleas of Berks County Criminal Division at
No(s):  CP-06-CR-0001485-2018

BEFORE:  KUNSELMAN, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY BENDER, P.J.E.:                **FILED JUNE 23, 2026**

Jonathan Fernando Rodriguez-Quijano ("Appellant") appeals *nunc pro tunc* from his aggregate judgment of sentence of 15 to 30 years of incarceration after his convictions for four counts of unlawful possession of a firearm, 18 Pa.C.S. § 6105(a)(1).  Appellant assails the weight of the evidence supporting his convictions.  We affirm.

The trial court set forth the facts of this case as follows:

> On March 15, 2018, at 9:20 a.m., Segreant Larry Smith (hereinafter referred to as "Sergeant Smith") and Berks County Sheriff's Deputy Craig Thorn (hereinafter referred to as "Deputy Thorn") executed an arrest warrant for Fernando Rodriguez at 735 N. 8th Street, Reading, Berks County, Pennsylvania (hereinafter referred to as "Residence").  After Deputy Thorn knocked on the door several times, Appellant answered the door.  Deputy Thorn explained to Appellant what he was doing there and who he was looking for.  Appellant told Deputy Thorn that Fernando Rodriguez was his father and that the Residence was Appellant's.  Fernando Rodriguez was not there because Appellant had recently kicked

him out. Fernando Rodriguez had not been there for two (2) weeks. Deputy Thorn asked Appellant if he could come in and Appellant invited him into the Residence. Once they entered, Deputy Thorn asked Appellant if there was anyone else in the Residence. Appellant told Deputy Thorn that his cousin was in a rear bedroom on the first floor and his mother was in a bedroom on the third floor. Deputy Thorn and Sergeant Smith made their way through the first floor, going through the living room, a dining area, the kitchen, and the rear bedroom. Just inside the left side of the doorway in the rear bedroom, Deputy Thorn saw a rifle standing up, leaning against a bag. Appellant's cousin, Luis Morales[,] was also in the rear bedroom, laying [*sic*] on the bed.

Deputy Thorn then proceeded to the second floor of the residence. In the front bedroom on the second floor, in plain view, there was another rifle leaning against a bookcase and a wall. There were no people found on the second floor. Appellant's mother was located on the third floor of the Residence. A fourth person, Jesus Crespo, was also located in the living room of the Residence when the officers entered.

Deputy Thorn told Deputy Guy Lehman (hereinafter referred to as "Deputy Lehman") about the firearms they had located. While in the front room of the Residence, Deputy Lehman heard a conversation between one of the other deputies and the individuals from the residence about the firearms located inside the Residence. Appellant was asked several times during this conversation if the firearms belonged to him, he said they did not, however, at one point he said to just pin the guns on him. Deputy Lehman asked Appellant along with the other individuals that were in the Residence, if any of the guns belonged to them. They all said no and that they did not know how they got into the Residence.

Deputy Lehman then retrieved both the firearms and checked to see if they were stolen. The firearm located on the first floor was an AK-47, and the firearm located on the second floor was a .30-06 rifle. All the individuals, including Appellant, remained in the living room of the Residence while Deputy Lehman checked to see if any of the firearms were stolen. While Deputy Thorn was waiting for the results on the firearms, he heard a conversation going on and knew that an investigation would have to be conducted, so he contacted the Reading Police Department. The Reading Police Department arrived in about twenty (20) minutes.

During the twenty (20) minutes it took for the Reading Police Department to arrive, the individuals continued talking to the deputies at the Residence. During this conversation, Appellant again said to pin the guns on him. When Deputy Lehman asked Appellant why he would do that, telling him he just wanted the truth and did not want to pin the guns on anyone, Appellant told Deputy Lehman that he was the man of the house and to just pin the guns on him.

After the Reading Police Department arrived[,] they made the decision to call the VICE Unit to respond so they had to wait again for VICE to arrive. While waiting, Deputy Lehman heard Appellant say something to the effect of "I will be straight with you. I have five guns in my bedroom, but none of them are in plain view…. Just take me to court. I'm not going to waive Rule 600. I will go straight to court."

While in the living room of the Residence, Appellant also told Officer Dale Trythall (hereinafter referred to as "Officer Trythall") that he was a convicted felon and that there were other firearms hidden in the bedroom on the second floor. Officer Trythall ran a check on each person in the Residence to see if they had a criminal history and found that both Luis Morales and Appellant had criminal histories.

Criminal Investigator Brian Errington (hereinafter referred to as "C.I. Errington") arrived at the scene and around 11:20 a.m., took Appellant into the kitchen of the Residence and had a private conversation with him. C.I. Errington read Appellant his **Miranda**[1] rights in the presence of another officer, asked if he understood his rights, and asked if he would speak to him. Appellant said he understood his rights and said that he would speak with C.I. Errington. Appellant told C.I. Errington that he understood that he had firearms in his residence and that he was a felon, so he knew he was not to possess them. C.I. Errington then asked if there were any other firearms in the Residence. Appellant told him there were four (4) to five (5) more rifles and shotguns in the front bedroom, his bedroom. When asked why he had these firearms when he knew he was not supposed to, Appellant said he is a collector of firearms and World War II era firearms.

_____

[1] **Miranda v. Arizona**, 384 U.S. 436 (1966).

After obtaining a signed search waiver from each of the four individuals in the Residence, C.I. Errington conducted a search of the Residence. Included in his search was the second-floor front bedroom. The bedroom was messy and unorganized. C.I. Errington found ammunition in drawers, on top of drawers, in the closet, as well as rifles and shotguns in the closet. C.I. Errington found personal belongings of Appellant's in the second-floor bedroom, including clothing and mail addressed to Appellant.

Four firearms, a black barrel 22 caliber rifle and .410 shotgun, a black barrel wooden stock Golden State Arms 30-06 rifle, a black barrel wooden stock Winchester 12-16 gauge shotgun, and a black barrel wooden stock Winchester 1897 model shotgun, 12 gauge were found in the second-floor front bedroom as well. Throughout the Residence ammunition was found that would not have worked in the firearms located, as well as ammunition that would work in the firearms found in the Residence. C.I. Errington also located body armour [*sic*] vests on the first floor in the rear bedroom with the … assault rifle.

All the firearms located in the Residence were seized by C.I. Errington. The firearms were then brought to Officer James Yeasted (hereinafter referred to as "Officer Yeasted") who processed them for DNA and latent prints. Officer Yeasted located latent prints on the Winchester, Model 1897 shotgun; the Winchester, Model 12-16 gauge shotgun; and the Savage Arms, Model 219, 30-20 caliber rifle.

Corporal Justin Morrow (hereinafter referred to as "Corporal Morrow"), an expert in the area of latent print analysis and examination, received the fingerprints obtained by Officer Yeasted and obtained a ten-print card for Appellant. Corporal Morrow compared the latent prints obtained by Officer Yeasted to the known prints obtained from Appellant and concluded that, of the six (6) prints submitted for analysis, five (5) lacked sufficient characterizations or clarity for comparison purposes, however he was able to draw a conclusion that one (1) print taken from the firearms located at the Residence was Appellant's.

Trial Court Opinion ("TCO"), 12/8/25, at 3-7 (citations omitted).

On January 14, 2019, the jury convicted Appellant of four counts of unlawful possession of a firearm, as noted above. Thereafter, the court

sentenced Appellant on each count to a term of five to ten years of incarceration, and ordered that three of those terms run consecutively to each other, with the last term being imposed concurrently. Thus, Appellant received an aggregate sentence of 15 to 30 years of incarceration. Appellant filed a timely notice of appeal, and this Court affirmed Appellant's judgment of sentence. *Commonwealth v. Rodriguez-Quijano*, 407 MDA 2019, 2020 WL 919207 (filed Feb. 26, 2020) (unpublished memorandum). The Pennsylvania Supreme Court denied Appellant's request for *allocatur* on August 12, 2020. *Commonwealth v. Rodriguez-Quijano*, 237 A.3d 969 (Pa. 2020) (table).

Appellant filed a timely *pro se* petition under the Post Conviction Relief Act (42 Pa.C.S. §§ 9541-9546) on February 5, 2021, and counsel was appointed. On August 21, 2025, counsel filed an amended petition on Appellant's behalf. Following a hearing, with the agreement of the parties, the trial court reinstated Appellant's right to appeal his judgment of sentence *nunc pro tunc.* Order, 10/7/25. Appellant filed his notice of appeal on October 23, 2025.[2] Both Appellant and the trial court have complied with Pa.R.A.P. 1925.

_____

[2] Appellant received merits review on direct appeal, and it is therefore not clear on what basis the PCRA court could lawfully restore Appellant's right to a direct appeal. *See generally Commonwealth v. Rosado*, 150 A.3d 425, 433 (Pa. 2016) (explaining that "errors which *completely* foreclose appellate review amount to a constructive denial of counsel and thus ineffective assistance of counsel *per se*, whereas those which only *partially* foreclose such
*(Footnote Continued Next Page)*

Appellant phrases his issue on appeal as follows:

> Whether the trial court erred in denying Appellant's post-sentence motion challenging the weight of the evidence where it is clear from the record that the verdict issued finding that Appellant possessed, used, manufactured, controlled, sold or transferred

---

review" do not). Here, direct appeal counsel chose not to include the weight-of-the-evidence claim in the Rule 1925(b) statement in lieu of other claims. Accordingly, the presumption of prejudice would not apply and Appellant should have been required to plead and prove that the decision to abandon this claim caused prejudice, *i.e.*, a reasonable probability that Appellant would have prevailed on direct appeal had the claim been pursued. ***See Commonwealth v. Blakeney***, 108 A.3d 739, 750 (Pa. 2014) ("To establish *…* prejudice in the appellate representation context, the petitioner must show that there is a reasonable probability that the outcome of the direct appeal proceeding would have been different but for counsel's deficient performance.").

However, because the PCRA court restored appellate rights in **timely** PCRA proceedings, we conclude that binding caselaw precludes this Court from reviewing the underlying legal concession. ***Compare Commonwealth v. Ballance***, 203 A.3d 1027, 1033 (Pa. Super. 2019) (vacating order entered by PCRA court restoring direct appeal rights where Ballance failed to plead and prove an exception to the PCRA's one year time-bar). In ***Commonwealth v. Walter***, a capital defendant received merits review on direct appeal. In timely PCRA proceedings, the PCRA court, with the Commonwealth's consent, restored Walter's appellate rights. Over then-Chief Justice Saylor's dissent, the Court addressed Walter's claims.

> Here, [Walter] filed a timely PCRA petition, vesting the PCRA court with the jurisdiction to grant PCRA relief. The PCRA court entered an order granting relief—reinstatement of [Walter]'s appellate rights *nunc pro tunc*—and, because the Commonwealth did not challenge that order, it became final and effective 30 days later.

***Commonwealth v. Walter***, 119 A.3d 255, 260 (Pa. 2015) (citations omitted). Similarly, the Commonwealth's concession and failure to appeal the order granting reinstatement both authorizes and requires this Court to address the merits of Appellant's claim.

- 6 -

the firearm at a time after the disabling felony drug conviction was contrary to the weight of the evidence, as:

1. The Commonwealth expert was unable to determine when the fingerprint was placed on the firearm;

2. The Commonwealth failed to establish that Appellant had exclusive use of the room where the firearms were found by law enforcement; and,

3. The law enforcement officers who testified had contradicting recollection of the specific statements made by Appellant at the time his home was searched by law enforcement?

Brief for Appellant at 5 (unnecessary capitalization omitted).

Preliminarily, we note that a verdict is against the weight of the evidence "only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. VanDivner*, 962 A.2d 1170, 1177 (Pa. 2009) (citation omitted). "[A] true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed." *Commonwealth v. Miller*, 172 A.3d 632, 643 (Pa. Super. 2017) (citation omitted). It is well-established that a weight of the evidence claim is addressed to the discretion of the trial court, and "[a] new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion." *Commonwealth v. Widmer*, 744 A.2d 745, 752 (Pa. 2000).

Further, when evaluating the trial court's ruling, we must remember that an abuse of discretion is not merely an error in judgment. *Commonwealth v. Arnold*, 284 A.3d 1262, 1277 (Pa. Super. 2022). Instead, an abuse of discretion is shown when a court's decision is based upon bias, partiality,

prejudice, ill-will, manifest unreasonableness, or a misapplication of the law. *Id.* By contrast, a proper exercise of discretion conforms to the law and is based on the facts of record. *Id.*

Importantly, the trial court's role in addressing a weight claim is to determine whether, notwithstanding all the evidence, certain facts are so clearly of greater significance that to ignore them, or to give them equal importance with all other facts from the case, is to deny justice. *Widmer*, 744 A.2d at 752. On appeal, the Superior Court's role when considering a weight claim is to evaluate the trial court's analysis of the issue. *Id.* Even so, because a motion for a new trial on the grounds that the verdict is contrary to the weight of the evidence concedes that there is sufficient evidence to support the verdict, neither is the court under an obligation to review the evidence in the light most favorable to the verdict winner. *Id.* Finally, appellate review "is limited to whether the trial judge's discretion was properly exercised, and relief will only be granted where the facts and inferences of record disclose a palpable abuse of discretion." *Commonwealth v. Diggs*, 949 A.2d 873, 879 (Pa. 2008).

In rejecting Appellant's weight of the evidence claim, the trial court stated:

> In the case at bar, Appellant claims the verdict was against the weight of the evidence. However, the verdict was not contrary to the evidence as the jury was presented with a case upon which to convict Appellant. The jury evaluated the evidence, determined the credibility of the witnesses and, when assessing the weight of the evidence, believed the evidence presented by the Commonwealth and rendered a guilty verdict. Specifically, the

Commonwealth presented evidence that Appellant's fingerprint was found on one of the firearms in the Residence. The jury found this testimony to be credible and rendered a guilty verdict The Commonwealth also presented evidence that Appellant stated he possessed the firearms even though he was a felon and thereby prohibited from doing so. The Commonwealth presented testimony from Parole Agent Kyle Hartman who supervised Appellant following his guilty plea to the charge of possession with intent to deliver a controlled substance. After hearing this testimony and evidence, the jury determined that Appellant was a person not to possess firearms and did in fact possess the firearms located in the Residence, even if Appellant did not have exclusive use of the room where the firearms were located. Finally, the Commonwealth presented testimony from the law enforcement officers who were at the Residence that either overheard Appellant speaking with others or had conversations with him. The jury determined as the finder of fact that the testimony from the law enforcement officers at the Residence was reliable and rendered a guilty verdict. Therefore, the verdicts were consistent with the evidence presented and did not shock anyone's sense of justice.

TCO at 8 (citations omitted, some formatting altered).

After reviewing the record, we find no abuse of discretion in the court's analysis. Indeed, the record reflects overwhelming circumstantial and direct evidence connecting Appellant to the firearms recovered from the Residence. Each of Appellant's three arguments, considered both collectively and individually, falls well short of demonstrating that the jury verdict shocks one's sense of justice. For example, multiple officers testified that Appellant repeatedly made inculpatory statements regarding the weapons, including telling deputies to "just pin the guns on" him, explaining that he was "the man of the house," and ultimately admitting that additional firearms were located in his bedroom despite his awareness that, as a convicted felon, he was prohibited from possessing them. The jury was free to credit Appellant's

admissions. *See Commonwealth v. Garcia Arce,* 352 A.3d 495, 510 (Pa. Super. 2026) (stating that the fact that the jury believed one witness over another does not render the verdict shocking to one's sense of justice).

Further, the Commonwealth introduced physical evidence corroborating Appellant's statements. Investigators recovered Appellant's fingerprint from one of the seized firearms. Although Appellant emphasized that the Commonwealth could not determine *when* his fingerprint was placed on the weapon, such an argument goes to the weight that the jury chose to assign that piece of evidence, not to its admissibility or probative value. *See Commonwealth v. Richardson*, 383 A.2d 510 (Pa. 1978) (noting that an appellant's claims related to when a fingerprint was placed on a door jamb present a credibility question for a jury to determine, and do not implicate admissibility).

We note as well that, since a weight of the evidence claim concedes that sufficient evidence was produced to support the verdict, the question is only whether the jury's credibility determination was so unreasonable as to constitute injustice. The fingerprint is one piece of a considerably larger evidentiary picture, and the fact that we cannot know when the fingerprint was placed on the firearm does not render the verdict shocking in light of the other evidence presented. In reaching a verdict, the jury was free to consider the fingerprint evidence along with evidence of Appellant's admissions, the location of the firearms in Appellant's bedroom, and Appellant's personal

belongings being found in the second-floor bedroom that Appellant identified as his own.

Appellant next argues that the Commonwealth failed to establish his exclusive use of the second-floor bedroom where the firearms were recovered. Yet, the Commonwealth was not required to establish *exclusive* possession of the weapons in order for the jury to properly conclude that Appellant *constructively* possessed the firearms. Appellant's personal belongings were found in the vicinity of the guns, and Appellant directed C.I. Errington to "his bedroom" where additional guns would be found. Appellant also admitted to C.I. Errington that he was a felon and he knew he was not permitted to own guns. When asked why he kept the weapons despite his inability to possess them legally, Appellant told C.I. Errington that he was a collector. The presence of others in the Residence at the time of arrest does not preclude the jury from concluding that Appellant possessed the firearms, and the trial court did not abuse its discretion in so finding. ***Commonwealth v. Rojas-Rolon***, 256 A.3d 432, 438 (Pa. Super. 2021)) ("To find constructive possession, the power and intent to control the contraband does not need to be exclusive to the appellant … and may be found in one or more actors where the item in issue is in an area of joint control and equal access.") (internal citation omitted).

Appellant's third argument in support of his claim that the verdict was contrary to the weight of the evidence – that the officers offered contradictory recollections regarding his statements – is precisely the type of credibility

determination that falls within the jury's exclusive province. Minor inconsistencies in witness testimony do not render a verdict contrary to the weight of the evidence; to the contrary, such inconsistencies are the foundation of juror deliberations. **See Widmer, supra**, 744 A.2d at 752 ("A new trial should not be granted because of a mere conflict in the testimony.") Critically, while the officers may have differed on peripheral details, they were materially consistent regarding the substance of Appellant's admissions and were corroborated by the physical evidence found during the search. The trial court acted within its discretion in concluding that the verdict was supported by the evidence.

Reviewing the record as a whole, we see that the evidence against Appellant was substantial. Multiple officers heard him make unsolicited admissions to possessing multiple firearms. Appellant directed the officers to firearms that they had not yet found which were not in plain view in his bedroom. He gave a post-**Miranda** statement acknowledging both his status as a convicted felon and his knowing possession of the weapons. His fingerprint was recovered from one of the firearms. His personal belongings were recovered from the bedroom where the majority of the firearms were located. On this record, the jury's guilty verdict does not approach the threshold of shocking one's sense of justice, and the trial court's denial of Appellant's weight claim was not an abuse of its ample discretion here. Appellant essentially requests that we replace the trial court's credibility determinations with our own; this we cannot do. **See Commonwealth v.**

*Watson*, 292 A.3d 562, 570 (Pa. Super. 2023) ("[I]t is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.") (citation omitted).

After review, we conclude that the trial court properly denied Appellant's challenge to the weight of the evidence in his case.

Judgment of sentence affirmed.


Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary


Date: 06/23/2026